673 F.2d 647
 Terri Lee HALDERMAN, a retarded citizen, by her mother and
guardian, Winifred Halderman; et al., Plaintiff-Intervenors,
v.
PENNHURST STATE SCHOOL & HOSPITAL, et al.,
Pennhurst Parent-Staff Association, Intervenor.
Appeal of COMMONWEALTH OF PENNSYLVANIA, Defendants,
Pennhurst State School& Hospital, et al., in No. 78-1490.
Appeal of George METZGER, et al. in No 78-1564.
Appeal of Mayor Frank L. RIZZO, the City Council of
Philadelphia, and Leon Soffer in No. 78-1602.
 Nos. 78-1490, 78-1564 and 78-1602.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 23, 1981.
Decided Feb. 26, 1982.
 
 LeRoy S. Zimmerman, Atty. Gen., Allen C. Warshaw, Deputy Atty. Gen., Chief, Special Litigation, Robert B. Hoffman, Deputy Atty. Gen. (argued), Harrisburg, Pa., for Commonwealth appellants.
 Thomas M. Kittredge (argued), Jami Wintz McKeon, Morgan, Lewis & Bockius, Alan J. Davis, Mark A. Aronchick, Pauline Cohen, Philadelphia, Pa., for City and County appellants.
 Joel I. Klein (argued), H. Bartow Farr, III, Peter Scheer, Onek, Klein & Farr, Washington, D. C., for Pennhurst Parent-Staff Association, intervenor.
 David Ferleger (argued), Penelope A. Boyd, Philadelphia, Pa., for appellees Terri Lee Halderman, et al.
 Thomas K. Gilhool (argued), Frank J. Laski, Public Interest Law Center of Pennsylvania, Philadelphia, Pa., for appellees, Pennsylvania Ass'n for Retarded Citizens, et al.
 Peter F. Vaira, Jr., U. S. Atty., Philadelphia, Pa., Wm. Bradford Reynolds, Brian K. Landsberg (argued), Dept. of Justice, Washington, D. C., for the United States of America.
 Before SEITZ, Chief Judge, and ALDISERT, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 
 OPINION OF THE COURT
 
 1
 GIBBONS, Circuit Judge, with whom ALDISERT, WEIS, A. LEON HIGGINBOTHAM, Jr. and SLOVITER, Circuit Judges, join:
 
 
 2
 This appeal is before us on a remand from the Supreme Court, which on April 20, 1981, reversed our judgment upholding in part and modifying the permanent injunction ordered by the district court.[1]
 
 
 3
 * The Supreme Court's judgment remanded to this court "for further proceedings in conformity with the opinion of the Court." Accordingly it is necessary to examine that opinion, in the light of our prior opinion, to determine what issues must now be addressed. Our judgment, now reversed, rested upon a federal statute and a Pennsylvania statute.
 
 
 4
 The federal statute we relied upon is the "bill of rights" provision of the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6010 (1976). Proceeding on the assumption that Congress had constitutional authority under Section 5 of the Fourteenth Amendment to enact that section of the Act, we held that a private cause of action for the enforcement of the rights it defined should be implied.[2] That holding was predicated upon our belief that it was inappropriate for courts faced with a statute which fell within any of several constitutional grants of Congressional lawmaking authority to reject any source of such authority.[3] The Supreme Court, however, adopted a different standard, stating:
 
 
 5
 Although this Court has previously addressed issues going to Congress' power to secure the guarantees of the Fourteenth Amendment, ... we have had little occasion to consider the appropriate test for determining when Congress intends to enforce those guarantees. Because such legislation imposes congressional policy on a State involuntarily, and because it often intrudes on traditional state authority, we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment.... The case for inferring intent is at its weakest where, as here, the rights asserted imposed affirmative obligations on the States to fund certain services, since we may assume that Congress will not implicitly attempt to impose massive financial obligations on the States.
 
 
 6
 451 U.S. at 15-16, 101 S.Ct. at 1539. Applying this newly announced rule of statutory interpretation[4] to Section 6010, the Court held that it was not passed pursuant to Section 5 of the Fourteenth Amendment, but was merely a funding clause enactment. As such, the statute was subject to another rule of statutory interpretation: "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," for "(b)y insisting that Congress speak with a clear voice, we enable the States to exercise their choice (of participating in a federally funded program) knowingly, cognizant of the consequences of their participation." 451 U.S. at 17, 101 S.Ct. at 1540. Applying this clear statement requirement, the Court held:
 
 
 7
 We would be attributing far too much to Congress if we held that it required the States, at their own expense, to provide certain kinds of treatment. Accordingly, we reverse the principal holding of the Court of Appeals and remand for further proceedings consistent with this opinion.
 
 
 8
 451 U.S. at 31-32, 101 S.Ct. at 1547. The "principal holding" referred to is our holding that Section 6010 conferred substantive rights.[5] The precise holding in the Supreme Court's opinion is that we erred in that single respect.
 
 
 9
 Turning to our alternative state law grounds for affirming, to the extent we did, the relief ordered by the district court, the Supreme Court observed:
 
 
 10
 Respondents contend that, even if we conclude that relief is unavailable under federal law, state law adequately supports the relief ordered by the Court of Appeals. There are, however, two difficulties with that argument. First, the lower court's finding that state law provides a right to treatment may well have been colored by its holding with respect to § 6010. Second, the court held only that there is a right to "treatment," not that there is a state right to treatment in the "least restrictive" environment. As such, it is unclear whether state law provides an independent and adequate ground which can support the court's remedial order. Accordingly, we remand the state law issue for reconsideration in light of our decision here.[24]
 
 
 11
 451 U.S. at 31, 101 S.Ct. at 1547. Thus the Supreme Court has expressed no view on the question whether state law provides an independent and adequate ground which can support the district court order. We are directed to consider that question in light of the decision in In re Joseph Schmidt, announced by the Pennsylvania Supreme Court after our decision but prior to that of the Supreme Court. Implicit in that direction is a holding that the plaintiffs' federal law claims are of sufficient substance to support the exercise of pendent jurisdiction over that Pennsylvania law claim.
 
 
 12
 Finally, the Court addressed legal contentions advanced by the plaintiffs in support of the district court order which this court found it unnecessary to decide. Respecting the contention that Section 6063 of the Developmentally Disabled Assistance and Bill of Rights Act, which requires that state plans comply with several specific federal conditions, may be enforceable in a private action, the Court noted that the contention raised a number of issues, but concluded:These are all difficult questions. Because the Court of Appeals has not addressed these issues, however, we remand the issues for consideration in light of our decision here.
 
 
 13
 451 U.S. at 30, 101 S.Ct. at 1546. The Court also said:
 
 
 14
 For similar reasons, we also remand to the Court of Appeals those issues it did not address, namely, respondents' federal constitutional claims and their claims under § 504 of the Rehabilitation Act (of 1973, as amended in 1974, 1976, and 1978, 29 U.S.C. § 701 et seq.)
 
 
 15
 451 U.S. at 31, 101 S.Ct. at 1547. We do not understand the remand on these issues as directions that this court must consider and decide either constitutional or statutory supremacy issues which, in light of state grounds independent and adequate to support the district court order, may not have to be reached. Rather, we construe the Court's remand as leaving open for our reconsideration, to the extent we find it necessary for such a purpose, any grounds of decision which might support the order appealed from, except our previous holding that Section 6010 was enacted pursuant to Section 5 of the Fourteenth Amendment and thus conferred substantive rights.
 
 
 16
 The Supreme Court found no fault with the district court's findings of fact, or with the standing of the United States as an intervening plaintiff. Thus there is no need for a repetition of the discussion in Parts II and III of our prior opinion.[6] Moreover the Court did not address those issues respecting scope of relief which are discussed in Part VII of our prior opinion.[7] Thus, assuming the propriety of some legal standard upon which relief could be predicated, there is no occasion, for purposes of this appeal, for a reconsideration of our discussion of the Commonwealth's Eleventh Amendment contention,[8] of objections to the definition of the class,[9] of objections to the use of a master,[10] or of other specific objections to provisions of the injunction which we rejected.
 
 II
 
 17
 When our prior decision was announced, the highest court of Pennsylvania had not yet definitively construed the effect on the habilitation of mentally retarded persons of that state's Mental Health and Mental Retardation Act of 1966 (hereinafter MH/MR Act of 1966), Pa.Stat.Ann. tit. 50, §§ 4101-4704 (Purdon 1969). We held that the MH/MR Act of 1966 provides a state statutory right to habilitation for such persons, that the plaintiffs could sue to enforce that right and that a federal court has pendent jurisdiction over such a claim, which was properly exercised in this instance.[11] Because the Supreme Court of Pennsylvania had not yet considered whether habilitation under the MH/MR Act of 1966 required the choice by the state of the least restrictive environment, while in our (mistaken) view Section 6010 did, we found it unnecessary to speculate about how that Court would construe the state statute in this respect.[12] Since our decision, however, In re Joseph Schmidt, 494 Pa. 86, 429 A.2d 631 (1981), has been decided, and the state court has spoken definitively.
 
 
 18
 Joseph Schmidt, a mentally retarded adult resided and received treatment from the age of eight at the expense of Allegheny County in a privately operated residential school for mentally retarded children. After 14 years of support for Schmidt in that school, the county petitioned the Court of Common Pleas of Allegheny County for his involuntary commitment to Western Center, a state-operated residential facility. The Commonwealth of Pennsylvania intervened as a respondent, contending that Schmidt's commitment to the Western Center facility would not be appropriate under the MH/MR Act of 1966. The parties did not dispute that neither Allegheny County nor the Commonwealth's Western Center provided a program which would enable Schmidt to receive adequate habilitation. The dispute was over which governmental unit, under the Pennsylvania statutory scheme, was primarily responsible in cases such as his for developing a plan for his habilitation. As in this case, the County contended that it had no obligation under the MH/MR Act of 1966 to provide supportive services which would eliminate the necessity for institutionalization. The Court of Common Pleas rejected the County's contention and ordered it to develop for Schmidt an individual practical life-management plan suitable to his needs. The Pennsylvania Supreme Court reversed, holding that under the MH/MR Act of 1966 the state rather than the county was responsible for developing a suitable placement for a mental patient so severely retarded that there is no alternative for his habilitation less restrictive than long term institutional residential placement. In deciding the allocation of responsibilities between the County and the Commonwealth, however, the Court made it clear that under Pennsylvania law both were bound by the same requirement of normalization. The opinion of the Court states:
 
 
 19
 We fully agree with the court below that the legislative scheme was designed to require the county to provide those supportive services where they would eliminate the necessity of institutionalization, even where those services would be required on a long term basis.
 
 
 20
 With the acceptance of the principle of "normalization" and the resultant legislation, it is clear that the restrictive view urged by the county as to its obligations in the area is out of step. The concept of normalization envisions that the mentally retarded person and his or her family shall have the right to live a life as close as possible to that which is typical for the general population. Consistent with this concept is the requirement that the least restriction consistent with adequate treatment and required care shall be employed.
 
 
 21
 429 A.2d at 635-36. Addressing the regulations of that Pennsylvania Department charged with the responsibility for administering the MH/MR Act of 1966, the Court observed:
 
 
 22
 This (least restrictive alternative) approach to the problem of mental retardation was reflected in the regulations promulgated by the secretary pursuant to § 301 of the Act, 50 P.S. § 4301, on February 10, 1973. Regulations 5200 Appendix IV County Mental Health and Mental Retardation Program-Service Content of the Program. The following pertinent excerpts from these regulations are most instructive in the instant inquiry.
 
 
 23
 The County Program is the means by which minimum services as described in the act shall be readily available to promote the social, personal, physical and economical habilitation or rehabilitation of mentally retarded person with all due respect for the full human, social and legal rights of each person. This means that the health, social, educational, vocational, environmental and legal resources that serve the general population shall be marshalled and coordinated by the County Program to meet the personal development goals of mentally retarded persons, in accordance with the principle of normalization....
 
 
 24
 In keeping with this principle of normalization, the County is responsible to utilize county program funds for the mentally retarded to accomplish the following objectives:
 
 
 25
 . . . .
 
 
 26
 4. shaping and maintaining an environment most productive of basic human personality qualities involving parent-child and sibling relationships, environmental adaptation, self-awareness and learning motivation and ability;
 
 
 27
 5. specific training and learning situations designed and implemented to develop all potential;
 
 
 28
 6. community development and restructuring to achieve the maximum normalization for the mentally retarded person wherever he is.
 
 
 29
 I. Responsibility for Planning, Direction and Coordinated Delivery of Services-The Base Service Unit:
 
 
 30
 The County Administrator shall be responsible to provide for the establishment of an organizational unit consisting of multidisciplinary professional and non-professional services for persons who are mentally retarded and in need of service from the County Program .... The Base Service Unit shall be responsible to perform the following functions in such a way as to carry out the objectives of the County Program as stated above.
 
 
 31
 . . . .
 
 
 32
 D. Provide for comprehensive diagnosis and evaluation services to:
 
 
 33
 . . . .
 
 
 34
 3. Develop a practical life-management plan for the individual and his family and provide the necessary counseling and following-along services; ....
 
 
 35
 These regulations make it clear that the legislative grant of power to the counties under § 301(e)(3) of the Act, 50 P.S. § 4301(e)(3), empowering them to establish additional services and programs "designed to prevent ... the necessity of admitting or committing the mentally disabled to a facility" was intended to be utilized by the counties to minimize the necessity of institutionalization. It was more than a mere grant of power to be used at the county's option. The power of the department to issue the regulations in question and to require the counties to assume the responsibilities set forth therein was clearly within the purview of section 201 of the Act, 50 P.S. § 4201, which charges the department to create a comprehensive and coordinate program in conjunction with the county governments. Moreover, any question as to the legislative recognition of the concept of normalization and the adoption of the doctrine of least restrictive alternatives in matters relating to the mentally retarded has been removed by the enactment of the Mental Health Procedures Act, Act of 1976, July 9, P.L. 817, No. 143, § 101; 50 P.S. § 7101.
 
 
 36
 429 A.2d at 636-37.
 
 
 37
 In the course of announcing that the MH/MR Act of 1966 embodied the least restrictive alternative means standard for achieving habilitation of the mentally retarded, the opinion of the Pennsylvania Supreme Court makes passing reference to the fact that the least restrictive alternative doctrine was first articulated by Chief Judge Bazelon in Lake v. Cameron, 364 F.2d 657 (D.C.Cir.1966), and subsequently adopted in a series of commitment and treatment related cases.[13] From the context, it is clear that the Court did not suggest that it was giving to the MH/MR Act of 1966 an interpretation not, perhaps, intended by the Pennsylvania legislature, but instead compelled by the federal constitution. Indeed the Attorney General does not suggest that the statutory interpretation of the MH/MR Act of 1966 announced in Schmidt is other than independent of federal law.[14]
 
 
 38
 The Pennsylvania law ground of decision being entirely independent of federal law, the sole remaining state law question is whether that ground of decision is adequate to support the order appealed from. Except to the extent that we previously required modification of the order, we hold that it is.
 
 
 39
 This case, unlike Schmidt, is a class action. In our prior decision we held that because for some members of the plaintiff class institutionalization might well be the least restrictive available means of habilitation, it was error to order the complete closing of Pennhurst without individualized determinations of need. Addressing the Pennsylvania legislation we observed that
 
 
 40
 we do not think that the Pennsylvania legislature, in providing a right to treatment in the Mental Health and Mental Retardation Act of 1966, intended to foreclose all institutionalization. In section 102 of that Act, for example, the legislature expressly included "institution(s)" within the category of "facilities" for which the Department of Welfare was responsible. Pa.Stat.Ann. tit. 50, § 4102. Thus, we see in the MH/MR Act of 1966 exactly the intent ascribed to it by Senator Pechan when he spoke in support of the measure.
 
 
 41
 The object of the legislation is to make it possible for every mentally disabled person to receive the kind of treatment he needs, when and where he needs it.
 
 
 42
 1966 Pa.Legis.J. 3d Spec.Secc., No. 33, 76 (Sept. 27, 1966). The state statute ... was focused on individual needs.
 
 
 43
 612 F.2d at 114-15. This interpretation of the MH/MR Act of 1966 was fully confirmed by the Schmidt decision. That case involved a dispute between two governmental units over allocation of burdens among them, which in the particular instance of a single individual was resolved in favor of the County. The resolution in Schmidt resulted from the Pennsylvania Supreme Court's conclusion that where long term institutional care is in fact the least restrictive means of habilitation, institutionalization is permissible and the state is obliged to provide it. Our prior holding that individual determinations must be made for each member of the class is entirely consistent with the holding that Joseph Schmidt must be provided a place in a state facility.
 
 
 44
 But unlike Schmidt, we have before us numerous class members who the court found should not be in Pennhurst. For these the court ordered that suitable community living arrangements be provided, and enjoined the county defendants from recommending future commitments to Pennhurst without an individual determination that a community living arrangement or other less restrictive environment would be suitable.[15] These holdings are also consistent with the Schmidt opinion, for while the opinion recognizes that under the MH/MR Act of 1966 the state was given responsibility for overall supervision and control of the statutory program, it expressly rejected Allegheny County's contention that the County had no obligation to provide merely ameliorative services until a state placement could be arranged. 429 A.2d at 635. The allocation, in the order appealed from, of responsibility among the county and state defendants based upon individualized determinations as to what is the least restrictive environment in which habilitation can take place, is completely congruent with the Schmidt court's interpretation of the MH/MR Act of 1966.
 
 
 45
 The defendants urge that because the Schmidt case did not present any issue of funding of proper care, it should not be regarded as controlling. (Appellants' Joint Brief on Remand, 54, citing 429 A.2d at 633.) Except that this is a class action, however, we are not persuaded that there is any essential difference in the posture of the Schmidt case and this. As in this case, the County attempted to limit its responsibility to petitioning for the commission of mentally retarded persons to a state residential facility. The Schmidt court made clear that the Pennsylvania law imposed the obligation on both levels of government to provide habilitation in that environment providing the least restriction on personal liberty consistent with habilitation. Insofar as financial burdens are concerned, it merely referred to Sections 508 and 509 of the MH/MR Act of 1966, which impose funding duties on both levels of government, and which provide mechanisms for the allocation of appropriated funds among the counties.[16] 429 A.2d at 633. The Commonwealth was ordered to find a placement for Schmidt in an institution with a staff-patient ratio suitable to his needs. There is no suggestion in the Schmidt opinion that this order would be qualified by the necessity for appropriations. Obviously the Schmidt Court anticipated that the adjustment mechanisms of Sections 508 and 509 would be operated in good faith. Nothing in the record which is before us on this appeal suggests that those mechanisms will be dismantled, will be operated other than in good faith, or are inhibited by the provisions of the judgment. On this record we, like the Supreme Court of Pennsylvania, must assume that the Pennsylvania legislature intends compliance with its statutes. Moreover, a Rule 60(b) motion would be the proper vehicle to present a showing that changed circumstances no longer require the use of a federal court master to administer a state program under state laws.
 
 
 46
 We conclude, therefore, that except as the order appealed from must be modified in accordance with our prior decision, the Pennsylvania MH/MR Act provides adequate support for it independent of federal law.
 
 III
 
 47
 Recognizing, as they must, that this court is bound by the Pennsylvania Supreme Court's interpretation of the MH/MR Act of 1966, the defendants urge that we may not rely on that Act as support for the order appealed from because the Eleventh Amendment is a bar to federal court consideration of that claim. The contention that neither the district court, this court, nor the Supreme Court has jurisdiction to consider plaintiffs' state law claims has not previously been advanced in this action, and from the dearth of authorities cited in its support, not previously advanced anywhere.[17] To put the Commonwealth's unique contention in context, a brief description of the parties and the nature of the action is appropriate.
 
 
 48
 First, the class action plaintiffs at this point in the proceedings seek only prospective injunctive relief. Second, although Pennhurst State School and Hospital, which apparently is a division of the Department of Welfare, is named as a defendant, there are numerous individual state officers who have been joined as defendants in their official capacities. Thus, insofar as prospective injunctive relief is sought against those defendants, the case is a classic example of an action falling within Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Third, the United States is an intervening plaintiff, see, 42 U.S.C. 1997(c) (1976), against which even the state itself cannot successfully plead the Eleventh Amendment as a bar to jurisdiction. See, e.g., United States v. North Carolina, 136 U.S. 211, 10 S.Ct. 920, 34 L.Ed. 336 (1890); United States v. Minnesota, 270 U.S. 181, 46 S.Ct. 298, 70 L.Ed. 539 (1926). Fourth, the counties, even as juridical entities, do not fall within the coverage of the Eleventh Amendment. Lincoln County v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890). Against those defendants even money damages may be awarded. Finally, as we held in our prior opinion, in a suit against state officials for injunctive relief the Eleventh Amendment is no bar to prospective injunctive relief even though such relief realistically will impose financial burdens which will be met by the state treasury.[18] Thus it is quite plain that the Eleventh Amendment is no bar to the prospective injunctive relief which was ordered by the district court insofar as that relief is predicated on constitutional or federal statutory claims. Indeed, at oral argument the deputy attorney general representing the Commonwealth defendants conceded that if we did not consider claims under MH/MR Act of 1966, we would have jurisdiction to decide, and indeed must decide, those federal claims.
 
 
 49
 The Commonwealth defendants urge, nevertheless, that the Eleventh Amendment applies in a particular and different way to causes of action based upon state law, over which a federal court is asked to exercise pendent jurisdiction. The contention is made that while peculiarly federal interests may justify the holdings of Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and of Edelman v. Jordan, 415 U.S. 651, 667-68, 94 S.Ct. 1347, 1357-58, 39 L.Ed.2d 662 (1974), no such interests justify entertaining causes of action based upon state law. This argument is predicated upon misunderstandings both of the meaning of the Eleventh Amendment and of the doctrine of pendent jurisdiction.
 
 That amendment reads:
 
 50
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State. (Emphasis supplied.)
 
 
 51
 It was adopted in reaction to the exercise by the Supreme Court of original jurisdiction in Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), solely on the ground that the plaintiff was a citizen of another state. The italicized language, which would otherwise be surplusage, shows, when compared with Article III Section 2 of the Constitution, that only a narrow and technical amendment to the latter was intended. So the amendment was long understood.[19] In the post-Reconstruction era, however, the original interpretation of the amendment came under pressure for political and economic reasons which are not of immediate relevance.[20] Eventually in Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the Court effectively rewrote the amendment as if it did not contain the last fourteen italicized words, by holding that it was intended, at least to some extent, to constitutionalize a doctrine of state sovereign immunity.
 
 
 52
 If the Hans v. Louisiana interpretation of the amendment were to be taken literally, no federal court could entertain an action against officials acting under color of state law. The consequences of such a rule were intolerable, and eighteen years after Hans v. Louisiana rewrote the amendment, the Court reconsidered. In Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), it substantially restored the earlier understanding, holding that a federal court could entertain an action for injunctive relief against state officials sued in their official capacities. Although federal question jurisdiction was relied upon, the Court's Eleventh Amendment discussion is separate from and independent of its conclusion that the complaint stated a claim arising under the Constitution and laws of the United States. 209 U.S. at 145, 28 S.Ct. at 448.
 
 
 53
 The decision in Ex Parte Young, which permitted district courts to enjoin the enforcement of state regulatory statutes, aroused considerable opposition in Congress-opposition which, in a compromise with proponents of more drastic curtailments of federal jurisdiction, produced the Three Judge District Court Act of 1910.[21] While the controversy aroused by Ex Parte Young was at its height, Siler v. Louisville & Nashville R.R. Co., 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909), came before the Court. Like Ex Parte Young it involved a challenge to state utility regulation on federal constitutional grounds. Federal jurisdiction depended on the existence of that federal question, but the plaintiffs also contended that the Kentucky Railroad Commission had exceeded its powers under the Kentucky enabling act. Justice Peckham, the author of Ex Parte Young, wrote for a unanimous court:
 
 
 54
 The Federal questions, as to the invalidity of the state statute because, as alleged, it was in violation of the Federal Constitution, gave the Circuit Court jurisdiction, and, having properly obtained it, that court had the right to decide all the questions in the case, even though it decided the Federal questions adversely to the party raising them, or even if it omitted to decide them at all, but decided the case on local or state questions only.
 
 
 55
 ... Of course, the Federal question must not be merely colorable or fraudulently set up for the mere purpose of endeavoring to give the court jurisdiction....
 
 
 56
 213 U.S. at 191-92, 29 S.Ct. at 454-55. Explaining the reason for entertaining pendent state law claims even in cases where a colorable federal claim is not decided, Justice Peckham continued:
 
 
 57
 Where a case in this court can be decided without reference to questions arising under the Federal Constitution, that course is usually pursued and is not departed from without important reasons. In this case we think it much better to decide it with regard to the question of a local nature, involving the construction of the state statute and the authority therein given to the commission to make the order in question, rather than to unnecessarily decide the various constitutional questions appearing in the record.
 
 
 58
 213 U.S. at 193, 29 S.Ct. at 455. The rule that a federal court should rely upon a state law interpretation rather than decide a federal constitutional question was an old one even in 1909. Charles River Bridge v. Warren Bridge, 36 U.S. (11 Pet.) 420, 9 L.Ed. 773 (1837). What Siler added was the express recognition that the lower federal courts could entertain pendent state law claims not otherwise within their subject matter jurisdiction so as to implement that longstanding and important federal policy rule. The rule of preference for non-constitutional grounds of decision is a vital corollary to the power of judicial review, which recognizes that the exercise of that great function should be reserved for cases in which its exercise cannot otherwise be avoided. A decision on state statutory grounds leaves both the state legislature and Congress free to reconsider, and perhaps to avoid permanently, the need for exercise of the power of judicial review. See Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).
 
 
 59
 Siler is generally regarded as the seminal case on pendent jurisdiction. For our purposes its greatest significance is that it presented the identical problem before us: a case against state officers over which the federal court had federal question jurisdiction, despite the Eleventh Amendment, because of the holding in Ex Parte Young. Since the pendent jurisdiction rule originated in a case involving state officers, there cannot be, as the Commonwealth suggests, an Eleventh Amendment exception to that rule. Later developments of the pendent jurisdiction rule enlarged its scope to include cases where entertaining a state law claim advanced not the policy of avoiding constitutional adjudications, but only that of avoiding duplicative litigation. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). Some commentators have criticized the enlargement. See Shakman, The New Pendent Jurisdiction of the Federal Courts, 20 Stan.L.Rev. 262 (1968). So far as we know, however, no commentator or court has ever suggested that the Siler rule itself should be reconsidered, so as to force the federal courts to make pronouncements of constitutional law which might, if a state law ground would support the relief requested, come dangerously close to an advisory opinion about the constitution.
 
 
 60
 The Supreme Court's remand for further consideration of the federal constitutional questions establishes as law of the case for this court the substantiality of the federal questions supporting jurisdiction. Moreover, even if the Commonwealth's unique interpretation of the pendent jurisdiction rule as inapplicable to suits against state offers had any substance, the Court's express mandate that we reconsider the state law issue appears to preclude its adoption in this case by this court. And in any event, the Eleventh Amendment can offer no solace to the County defendants. Thus the pendent state law claim would have to be faced with respect to those defendants.
 
 
 61
 We hold, therefore, that the Eleventh Amendment is no bar to the exercise of pendent jurisdiction over a state law claim under the MH/MR Act of 1966, independent and adequate to support the order appealed from. See Frederick L. v. Thomas, 557 F.2d 373 (3d Cir. 1977).
 
 IV
 
 62
 The defendants also urge that the district court should have abstained from adjudicating the claim under the MH/MR Act of 1966. There was no pending state proceeding, criminal or civil, to which the rule of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny could apply. Thus a dismissal of the complaint would clearly have been inappropriate.
 
 
 63
 As to abstention under Railroad Comm'n. of Texas v. Pullman Company, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), it is difficult to see how a case for the application of that rule was made out in the district court. The plaintiffs were contending for injunctive relief against intolerably inhumane conditions on both federal and state law grounds. Pullman suggests the retention of jurisdiction in cases where state law is challenged on constitutional grounds, and an interpretation of state law suggested by the defendants might make unnecessary the decision of a constitutional law issue. See, e.g., Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944). In this case the plaintiffs' position has all along been that the MH/MR Act of 1966 is consistent with the requirements of the Fourteenth Amendment, while the defendants have urged a construction of that Act which would force the court to consider the Fourteenth Amendment grounds of decision. At the time the district court acted, abstention with a retention of jurisdiction would have left the class members in the intolerably inhumane conditions in which the district court found them, while the Commonwealth attempted to persuade the Pennsylvania Supreme Court that the MH/MR Act of 1966 afforded less relief than the plaintiffs sought. We now know from the decision in In re Schmidt that it would not have been successful. But even if it might have been the result would be just the opposite of what the Pullman rule was intended to achieve: requiring a constitutional law decision rather than avoiding it.
 
 
 64
 We note also that the district court had before it several federal statutory claims. These would remain in the case regardless of any Pennsylvania Court interpretation of the MH/MR Act of 1966. Whether Pullman abstention is ever proper in a case presenting federal statutory interpretation issues distinct from claims predicated directly on the constitution is a question we need not decide. The Pullman rule involves the exercise of discretion, and it cannot be held that the district court abused its discretion in granting relief from the conditions in Pennhurst in a case presenting such federal statutory claims. Finally, if the defendants mean to suggest that at this late stage, after the Supreme Court of Pennsylvania has given us a definitive construction of the MH/MR Act of 1966, we should completely unglue this several year-old case and start all over so that the Pennsylvania Supreme Court can tell us again, we reject that suggestion. At best, if we thought Pullman abstention on the state law claim might be appropriate, we would have to proceed to the consideration of federal claims which might otherwise support the order.[22] To do so, when we now have a definitive construction of a state statute, which supports most of the relief requested, would do violence to the letter of Siler and to the animating purpose of the Pullman rule.
 
 V
 
 65
 In one respect the MH/MR Act of 1966 does not lend support to the judgment appealed from. As noted in Part II above, and as we held in our prior decision,[23] that Act does not foreclose all institutionalization, and thus does not support that part of the judgment requiring the closing of Pennhurst. Since this is so, even under the Siler rule we must consider whether federal law, constitutional or statutory, requires that result. In this one respect federal law issues must be faced, and we reiterate our prior holding that the order directing the eventual closing of and barring all future admissions to Pennhurst went beyond what any federal statute or the Fourteenth Amendment requires.[24]
 
 
 66
 Since the MH/MR Act of 1966 is sufficient to support the judgment in other respects, the Siler rule prevents our consideration of plaintiffs' claims under the Fourteenth Amendment except to the limited extent discussed in the preceding paragraph.
 
 
 67
 Federal statutory supremacy claims do not implicate the rule against unnecessary constitutional law decisions to the same degree, since a decision on such grounds, while it binds the state legislature, leaves Congress free to act. In our prior opinion we recognized that distinction,[25] and decided one federal statutory supremacy issue, now reversed. Two such issues remain: whether Section 6063 of the Developmentally Disabled Assistance and Bill of Rights Act, which requires that state plans comply with several specific federal conditions, would support the judgment; and whether Section 504 of the Rehabilitation Act of 1973 would support it.
 
 
 68
 With respect to Section 6063, the Supreme Court noted several issues: whether any plaintiffs have a cause of action to enforce it; whether 42 U.S.C. § 1983 provides such a cause of action; whether Pennhurst's programs fall within Section 6063(b)(5)(C); and whether relief would be limited to an injunction against the federal government.[26] On none of those issues do we have findings of fact by the district judge. Moreover our examination of the record, with which we are obviously less familiar than he is, does not suggest that the facts necessary for decision of the issues presented by Section 6063 have been sufficiently developed.
 
 
 69
 Although in this court it is settled that Section 504 affords relief for private plaintiffs,[27] and although on this claim the district court did make findings of fact and conclusions of law, in our previous decision we declined to reach the Section 504 issues.[28] Except for the settled question of a private cause of action, the issues presented by Section 504 are at least as complex as are those posed by Section 6063. Moreover the district court's findings of fact were in this case made without the benefit of our recent en banc decision discussing allocation of burdens of production and of proof in cases based on antidiscrimination statutes such as Section 504.[29] If we undertook the arduous task of reviewing the district court's findings of fact bearing particularly on the applicability of Section 504 to the several programs for the mentally retarded involved in this case, it is possible that the only outcome would be a remand for reconsideration in light of the appropriate burden of production and proof.
 
 
 70
 Implicit in our prior decision was a holding that assuming Section 504 applies, as a matter of law it does not require the eventual closing of Pennhurst or the prohibition of all future referrals to that institution. But the remaining relief afforded to the class is supported by the MH/MR Act of 1966. In that circumstance it is clearly unnecessary, and probably inappropriate as well, to reach any more of the merits of the Section 504 claim.
 
 
 71
 It is possible that at some future time the Pennsylvania Legislature may take action which would on state law grounds suggest Rule 60(b) relief from some provisions of the injunction. In that event it will be necessary for the District Court to consider the Section 6063 issues, and perhaps to reconsider its prior Section 504 decision. If the court is presented with that situation these federal statutory supremacy issues which we have left open should be addressed, for they might well afford a basis for avoiding the decision of the plaintiffs' Fourteenth Amendment claims. Hagans v. Lavine, 415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974).
 
 VI
 
 72
 We have reconsidered our prior judgment as directed by the Supreme Court's mandate. Since, to the extent that we affirmed it, the district court's order is supported by the MH/MR Act of 1966, an independent state law adequate to that end, our judgment shall reissue in its original form.
 
 
 73
 ALDISERT, Circuit Judge, concurring.
 
 
 74
 Although I join in the majority opinion in all respects, I write separately to explain that I still adhere to the view that a "least drastic means" or "least restrictive alternative" obligation should not be imposed on the hospital authorities. I have previously expressed dissatisfaction with the use of such a test in a similar context:
 
 
 75
 (That) formulation is cast in terms of grandi astrazioni, predicating liability on notions of "substantial necessity," "compelling necessity," and "least intrusive means." These abstractions, dubbed in classroom jargon as constitutional law "buzz words," have the unfortunate capacity to mean all things to all people.
 
 
 76
 Romeo v. Youngberg, 644 F.2d 147, 182 (3d Cir. 1980) (in banc) (Aldisert, J., concurring), cert. granted, 451 U.S. 982, 101 S.Ct. 2313, 68 L.Ed.2d 38 (1981). I also have joined separate opinions of my colleagues voicing discontent with the "least restrictive" standard.[1]
 
 
 77
 As the majority opinion makes clear, however, our decision is controlled by state law; and although we are required as federal judges to express views on federal questions, we are bound by the Pennsylvania courts' interpretation of state law issues, even if those courts have adopted the "least restrictive" test. See In re Joseph Schmidt, 494 Pa. 86, ---, 429 A.2d 631, 636 (1981). I had hoped that somewhere a line would be drawn limiting the extension of this precept, but Pennsylvania has opted otherwise. Hobbes warned that the courts' "long study may increase and confirm erroneous Sentences: and where men build on false grounds, the more they build, the greater is the ruine."[2]
 
 
 78
 Like Chief Judge Seitz, I seriously question the propriety of the district court's appointment of a special master to supervise compliance with the original remedy. But because of the inordinate amount of time that has already passed and the extensive amount of funds expended, a retroactive reversal of the original order would be meaningless. There is simply no way of unscrambling this jurisprudential egg, no method of returning the funds to the Commonwealth. The best that can be hoped for is that these proceedings will be remanded without any further delay to the district court, which, upon proper motion, may take immediate steps to disassemble the judicially-created administrative hierarchy of special and hearing masters so that the federal court's order may be properly implemented by state officials under state law.
 
 
 79
 SEITZ, Chief Judge, with whom JAMES HUNTER III, Circuit Judge, joins, dissenting in part.
 
 
 80
 I agree with the majority that the eleventh amendment and abstention doctrines do not foreclose the exercise of pendent jurisdiction over the state law claims against the state and county officials. Although the eleventh amendment issue is not without doubt, I do not feel free to reach a contrary result in view of the United States Supreme Court authority that we have on the matter. See Louisville & Nashville Railroad v. Greene, 244 U.S. 522, 528-29, 37 S.Ct. 683, 686-87, 61 L.Ed. 1291 (1917) (pendent jurisdiction extended to state law claims against state officials even though an eleventh amendment objection to the district court's jurisdiction over the case was raised); Greene v. Louisville & Interurban Railroad, 244 U.S. 499, 508, 37 S.Ct. 673, 677, 61 L.Ed. 1280 (1917) (same). I also agree that Pennsylvania law provides for a right to habilitation in the least restrictive environment. Furthermore, I agree that federal statutory and constitutional law do not provide a greater remedy than state law provides in this case. See Halderman v. Pennhurst State School & Hospital, 612 F.2d 84, 116 (3d Cir. 1979) (Seitz, C. J., dissenting), rev'd, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).
 
 
 81
 The district court appointed a special master "with the power and duty to plan, organize, direct, supervise and monitor the implementation of this and any further Orders of this Court." 446 F.Supp. at 1326. Because the Supreme Court rejected this court's reliance on section 6010 of the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6010 (1976), as a basis for the right to habilitation in the least restrictive environment, I believe the issue of the propriety of the remedy, including the appointment of a special master, is once again before us.
 
 
 82
 Although I believe the district court did not abuse its discretion in appointing the master to assist the court in formulating a remedy, I would reverse that portion of the order authorizing the master to supervise the defendants' compliance efforts. I believe that a federal court must assume that a state will comply with a federal court order. Principles of federal-state comity require that the state be given an initial opportunity to comply with a remedial decree. See Wyatt v. Stickney, 344 F.Supp. 387, 393 (M.D.Ala.1972), aff'd in part and rev'd in part sub nom. Wyatt v. Aderholt, 503 F.2d 1305 (5th Cir. 1974). Consequently, I believe the appointment of a special master at the outset to supervise compliance is an abuse of discretion, at least absent a properly supported finding that the state would defy such a decree. Because no such finding was made, I believe that to the extent the order gave the master oversight responsibilities, the appointment was an abuse of discretion.
 
 
 83
 GARTH, Circuit Judge, concurring in part and dissenting as to relief:
 
 
 84
 I disagree with the majority in its disposition of the only real issue-the key issue-which is the relief to be accorded the plaintiffs. In my view, the majority opinion in the merits appeals is seriously mistaken when it asserts that the Supreme Court "did not address those issues respecting scope of relief," and that therefore "there is no occasion, for purposes of this appeal, for a reconsideration ... of objections to the use of a master." Maj. Op. at 651. This assertion misconstrues the Supreme Court's specific holding in Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), which indicated strong disapproval of the district court's appointment of a Master. Moreover, it contradicts one of the basic tenets of the remedial power of the federal courts: "the nature of the violation determines the scope of the remedy," Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). In holding, correctly in my view, that the proper basis for relief in this case is neither federal constitutional law (as the district court had concluded) nor federal statutory law (as this court had concluded in its earlier en banc decision), but rather state law, the majority announces a dramatic transformation in the nature of the violation found in this case. In my opinion, however, the ultimate conclusion that the majority reaches is illogical and inconsistent with principles announced by the Supreme Court. I therefore strongly dissent from the majority opinion respecting the relief to be accorded plaintiffs.
 
 
 85
 It appears to me that Pennsylvania's own statutes, regulations, and decisional law are fully adequate to protect the right to habilitation in the least restrictive environment which Pennsylvania law guarantees. Under these circumstances, essential principles of federalism and comity dictate that this court should not approve use of the intrusive device of appointing a master in the absence of evidence that an order enjoining compliance with Pennsylvania's own procedures, similar to that ordered by this court in Rennie v. Klein, 653 F.2d 836 (3d Cir. 1981) (en banc), would be inadequate to protect the plaintiffs' state law right to habilitation in the least restrictive environment. Accordingly, I would vacate the district court's orders of March 17, 1978, and April 24, 1980, appointing a Special Master and a Hearing Master, and remand the case to the district court with instructions to enter an order enjoining the defendants to comply with Pennsylvania's own statutes, regulations, and decisional law.
 
 I.
 
 86
 I concur in Parts III and IV of the majority opinion in the merits appeals, which reject the defendants' eleventh amendment and abstention objections to the exercise of pendent jurisdiction over the state law claims. I also agree with Part V of the majority opinion, which holds that the order of the district court directing the closing of Pennhurst is not supported by federal statutory or constitutional law. Finally, I agree with Part II of the majority opinion insofar as it concludes that Pennsylvania law provides for a right to habilitation in the least restrictive environment.
 
 II.
 
 87
 I joined the earlier opinion of this court modifying the district court's order of March 17, 1978, see Halderman v. Pennhurst State School & Hospital, 612 F.2d 84 (3d Cir. 1979) (en banc), because I believed at the time that the Developmental Disabilities Assistance Act, 42 U.S.C. § 6001 et seq. ("the Act"), provided for a federal right to habilitation in the least restrictive environment. Specifically, I agreed that the "Bill of Rights" section of the Act, 42 U.S.C. § 6010, had adopted the "least restrictive" concept and that, being passed pursuant to Congress's fourteenth amendment enforcement powers, § 6010 could support the district court's order mandating that long-term habilitation take place in community living arrangements rather than in institutions.
 
 
 88
 While I had grave doubts about the extension of the "least restrictive" concept beyond the first amendment context in which it originated, see, e.g., Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), and for which it is most appropriate, two factors persuaded me to join this court's earlier en banc decision. First, a federal statute -the Developmental Disabilities Act-had incorporated this principle, allaying concerns over the propriety of a decision by the courts to assume on their own initiative the intrusive level of review entailed by the "least restrictive" doctrine. Second, the "least restrictive" concept seemed to be relatively manageable and appropriate in the context of decisions involving long-term institutionalization as opposed to habilitation in the community. In comparison, adoption of the "least restrictive" doctrine in the context of treatment decisions made within institutions would entail extraordinarily detailed judicial supervision over the numerous medical decisions that must be made in the course of treatment. See Rennie v. Klein, 653 F.2d 836, 855-65 (3d Cir. 1981) (en banc) (Garth, J., concurring); Romeo v. Youngberg, 644 F.2d 147, 182-85 (3d Cir. 1980) (en banc) (Aldisert, J., concurring), cert. granted, 451 U.S. 982, 101 S.Ct. 2313, 68 L.Ed.2d 838 (1981); Halderman v. Pennhurst State School and Hospital, supra, 612 F.2d at 126-30 (Seitz, C. J., dissenting). In short, the doctrine of least restrictive environment -as opposed to least restrictive treatment -at that time appeared acceptable to me, so long as it appeared to have been incorporated by federal statute.
 
 
 89
 On appeal, however, the Supreme Court rejected the basis on which this court had predicated its en banc decision. The Court held that the Act was not passed pursuant to Congress's power to enforce the fourteenth amendment, but was instead simply a funding statute. The Court also found that § 6010 created no substantive rights or enforceable obligations, and that that section had been "intended to encourage, rather than mandate, the provision of better services to the developmentally disabled." Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 20, 101 S.Ct. 1531, 1541, 67 L.Ed.2d 694 (1981). Finally, the Court was nearly unanimous in holding that the proper remedy for a violation of the Act would not be an order appointing a master to oversee the district court's far-reaching and costly injunction, but rather an order stating what was necessary to satisfy the terms of the Act, and enjoining Pennsylvania either to comply with those terms or to forego federal funds. See Pennhurst, supra, 451 U.S. at 53-55, 101 S.Ct. at 1558-59 (White, J., dissenting in part, joined by Brennan and Marshall, JJ.); 451 U.S. at 30 n.23, 101 S.Ct. at 1546 n.23 (majority opinion) (specifically approving of Justice White's views on this point). The Court then remanded the case to this court for decision on a variety of issues not resolved in our earlier en banc opinion,[1] including the impact of In re Joseph Schmidt, 494 Pa. 86, 429 A.2d 631 (1981).
 
 
 90
 Interpreting the Supreme Court's mandate in an extraordinarily narrow way, the majority states that the Supreme Court "did not address" the propriety of the appointment of the Master,[2] and that therefore this issue need not even be discussed, let alone decided, on remand.[3] The majority's conclusion, however, does not even follow from its own narrow premise that only those issues explicitly "addressed" by the Supreme Court need be considered on remand, for the Supreme Court did in fact discuss the propriety of the relief ordered by the district court and approved by this court in its en banc opinion.
 
 
 91
 As noted, Justice White's dissenting opinion extensively discussed-and criticized-the relief ordered in this case:It is my view that the Court of Appeals should have adopted the Rosado v. (Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442) approach in these cases. It found the State to be in noncompliance with the federal statute in major respects and proceeded to impose a far-reaching remedy, approving the appointment of a Special Master to decide which of the Pennhurst inmates should remain and which should be moved to community-based facilities. More properly, the court should have announced what it thought was necessary to comply with the Act and then permitted an appropriate period for the State to decide whether it preferred to give up federal funds and go its own route. If it did not, it should propose a plan for achieving compliance, in which event, if it satisfied the court, a decree incorporating the plan could be entered and if the plan was unsatisfactory, the further use of federal funds could be enjoined. In any event, however, the court should not have assumed the task of managing Pennhurst or to decide in the first instance which patients should remain and which should be removed. As we recently recognized in Parham v. J.R., 442 U.S. 584 (99 S.Ct. 2493, 61 L.Ed.2d 101) (1979): "The mode and procedure of medical diagnostic procedures is not the business of judges. What is best for a child is an individual medical decision that must be left to the judgment of physicians in each case. We do no more than emphasize that the decision should represent an independent judgment of what the child requires and that all sources of information that are traditionally relied on by physicians and behavioral specialists that should be consulted." Id., at 607-608 (99 S.Ct. at 2507). Cf. Addington v. Texas, 441 U.S. 418, 429 (99 S.Ct. 1804, 1811, 60 L.Ed.2d 323) (1979) (commitment depends "on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists"). In enacting § 6010, Congress eschewed creating any specific guidelines on the proper level of institutionalization, leaving the question to the States to determine in the first instance. A court-appointed Special Master is inconsistent with this approach.
 
 
 92
 451 U.S. at 54-55, 101 S.Ct. at 1558-59 (White, J., dissenting in part).
 
 
 93
 Moreover, Justice Rehnquist, writing for the majority, explicitly adopted the dissent's reasoning and conclusions concerning the propriety of the relief ordered in this case:
 
 
 94
 We do not significantly differ with our Brother WHITE on the remedy for failure to comply with federally imposed conditions. Relying on Rosado v. Wyman, he argues that Pennsylvania should be given the option of rejecting federal funds under the Act or complying with § 6010. If we agreed that § 6010 was a condition on the grant of federal funds, we would have little difficulty subscribing to that view. We differ only in that he believes that § 6010 imposes conditions on participating States while we believe that the relevant conditions to this case are §§ 6011 and 6063(b)(5)(C). If the court on remand determines that there has been a violation of those conditions, it may well be appropriate to apply the principles announced in Rosado, as JUSTICE WHITE suggests.
 
 
 95
 451 U.S. at 30 n.23, 101 S.Ct. at 1546 n.23.
 
 
 96
 To be sure, the Supreme Court's virtually unanimous expressions of criticisms of the appointment of a Master[4] under the Developmental Disabilities Act are not directly controlling here, where the issue is the propriety of a federal district court's appointment of a Master to enforce a state law right.[5] The point is, however, that even if one were to accept the majority's cramped interpretation of the Supreme Court's mandate, this court would still have a duty to consider the propriety of the appointment of a Master, for, the majority's assertion notwithstanding, the Supreme Court did in fact "address" the "objections to the use of a Master."
 
 
 97
 More fundamentally, I cannot accept the majority's assumption that it is proper for this court to answer the defendants' objections to the appointment of a Master simply by citing to our earlier en banc opinion. That decision did not decide the key issue before this court now: whether a federal district court order appointing a Master can be upheld once it is determined that the basis for relief is not federal law but state law. That issue was not before either the Supreme Court or this court in its earlier decision, and indeed could not have been, since both of those decisions were concerned solely with federal law grounds for the relief that the Master was appointed to carry out.[6] Thus, the specific issue-whether a federally appointed Master may supervise implementation of a state law right when the state's own procedures are adequate to do so-is before this court for the first time, and must be squarely faced and decided.
 
 
 98
 The conclusion that the propriety of the Master is before this court is compelled by the Supreme Court's many pronouncements on the scope and extent of federal judicial remedial power. In contrast to the majority, which assumes that a remedy functions properly so long as "some standard upon which relief could be predicated" can be plugged into it, see Maj.Op. at 651, the Supreme Court has made it clear that right and remedy are inextricably intertwined. See Swann v. Charlotte-Mecklenburg Board of Education, supra (nature of the violation defines the scope of the remedy); Milliken v. Bradley, 418 U.S. 717, 738, 744, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974) (same). Indeed, Justice White's dissenting opinion in Pennhurst took note of this principle, observing that
 
 
 99
 (w)hat an appropriate remedy might be where state officials fail to observe the limits of their power under the United States Constitution or fail to perform an ongoing statutory duty imposed by a federal statute enacted under the commerce power or the Fourteenth Amendment is not necessarily the measure of a federal court's authority where it is found that a State has failed to perform its obligations undertaken pursuant to a statute enacted under the spending power.
 
 
 100
 451 U.S. at 53, 101 S.Ct. at 1558 (White, J., dissenting in part).
 
 
 101
 Similarly, what an appropriate remedy might be where state officials fail to observe the limits of their power under the federal Constitution (as the district court found) or fail to perform an ongoing statutory duty imposed by a federal statute enacted under the fourteenth amendment (as this court found in its previous en banc decision) is not necessarily the measure of a federal court's authority where it is found that a state has failed to perform its obligations under state law. Having predicated the violation on state law rather than federal law, the only proper course, in my view, is to face the question of the propriety of the relief ordered to correct that violation. I turn now to that question.
 
 III.
 
 102
 The Supreme Court's decision that the Developmental Disabilities Act does not require adoption of the "least restrictive" doctrine might very well bring to the fore once again my concerns as to the appropriateness of that doctrine. I am convinced, however, that Pennsylvania law incorporates a right to habilitation in the least restrictive environment, and-whatever may be my own views as to the advisability of recognizing such a right-I agree with the majority that this court must apply Pennsylvania law as interpreted by the Pennsylvania Supreme Court.
 
 
 103
 Specifically, the majority correctly reads the holding of the Pennsylvania Supreme Court in In re Schmidt, 494 Pa. 86, 429 A.2d 631 (1981), as a definitive statement that Pennsylvania law-in particular, the Mental Health and Mental Retardation Act of 1966 ("The MH/MR Act"), 50 Penn.Stat. §§ 4101-4704-provides for a right to habilitation in the least restrictive environment.[7] See Maj.Op. at 651-653. The MH/MR Act establishes an affirmative duty on the part of the state and the counties to implement the right of each developmentally disabled person to habilitation in the environment least restrictive, consistent with adequate care, of his ability "to live a life as close as possible to that which is typical for the general population." 429 A.2d at 636. This is to be done by mandating that no person be placed in an institution, rather than in a community living arrangement, except upon a showing that, for that particular individual (as was the case with Joseph Schmidt), long-term institutionalization is the only way that adequate mental retardation services can be provided. It was to ensure the enforcement of this right that the district court appointed a Master.
 
 
 104
 In approving the district court's order, as modified by our earlier en banc decision, the majority overlooks the fact that Pennsylvania law itself provides for mechanisms by which it would appear that enforcement of this right can be fully ensured. Under §§ 201(1), 201(4), and 202(b) of the MH/MR Act, 50 Penn.Stat. §§ 4201(1), 4201(4), and 4202(b), the state has the ultimate responsibility for the provision of adequate mental retardation services to all persons in need of them. As delineated by the Pennsylvania Supreme Court in Schmidt, however, the MH/MR Act establishes a bifurcated scheme for the actual delivery of those services. Where the individual requires institutionalization because the degree to which he is retarded makes it impossible for him to be adequately cared for in any other way, it is the state's responsibility to provide that care. On the other hand, where the individual may be able, with the proper support services, to live in the community, it is the county's responsibility to provide those services:
 
 
 105
 (T)he legislative scheme was designed to require the county to provide those supportive services where they would eliminate the necessity of institutionalization, even where those services would be required on a long term basis.
 
 
 106
 With the acceptance of the principle of "normalization" and the resultant legislation, it is clear that the restrictive view urged by the county as to its obligations in the area is out of step. The concept of normalization envisions that the mentally retarded person and his or her family shall have the right to live a life as close as possible to that which is typical for the general population. Consistent with this concept is the requirement that the least restriction consistent with adequate treatment and required care shall be employed.
 
 
 107
 In re Schmidt, supra, 429 A.2d at 635-36.[8] See §§ 301(d), 301(e) of the MH/MR Act, 50 Penn.Stat. §§ 4301(d), 4301(e).
 
 
 108
 Moreover, as the Pennsylvania Supreme Court pointed out in Schmidt, this "least restrictive environment" approach has been adopted by regulations issued by the Secretary of the Department of Public Welfare pursuant to § 301 of the MH/MR Act, 50 Penn.Stat. § 4301. These regulations, entitled "County Mental Health and Mental Retardation Program-Service Content of the Program," provide in part:
 
 
 109
 The County Program is the means by which minimum services as described in the act shall be readily available to promote the social, personal, physical and economical habilitation or rehabilitation of mentally retarded person(s) with all due respect for the full human, social and legal rights of each person. This means that the health, social, educational, vocational, environmental and legal resources that serve the general population shall be marshalled and coordinated by the County Program to meet the personal development goals of mentally retarded persons, in accordance with the principle of normalization....
 
 
 110
 In keeping with this principle of normalization, the County is responsible to utilize county program funds for the mentally retarded to accomplish the following objectives:
 
 
 111
 4. shaping and maintaining an environment most productive of basic human personality qualities involving parent-child and sibling relationships, environmental adaptation, self-awareness and learning motivation and ability;
 
 
 112
 5. specific training and learning situations designed and implemented to develop all potential;
 
 
 113
 6. community development and restructuring to achieve the maximum normalization for the mentally retarded person wherever he is.
 
 
 114
 I. Responsibility for Planning, Direction and Coordinated Delivery of Services-The Base Service Unit :
 
 
 115
 The County Administrator shall be responsible to provide for the establishment of an organizational unit consisting of multidisciplinary professional and non-professional services for persons who are mentally retarded and in need of service from the County Program.... The Base Service Unit shall be responsible to perform the following functions in such a way as to carry out the objectives of the County Program as stated above.
 
 
 116
 D. Provide for comprehensive diagnosis and evaluation services to:
 
 
 117
 3. Develop a practical life-management plan for the individual and his family and provide the necessary counseling and following-along services; ....
 
 
 118
 Quoted in In re Schmidt, supra, 429 A.2d at 636.
 
 
 119
 The Pennsylvania Supreme Court made it clear in Schmidt that the Commonwealth and the counties have a duty to develop these services if they do not currently exist. In the case of Joseph Schmidt himself, the Court noted:
 
 
 120
 It is the state's responsibility to find a placement for Joseph with a staff-patient ratio suitable to his needs. The state will not be allowed to ignore that responsibility and that obligation by stating that an appropriate facility is not immediately available. Section 201(1) of the Act, 50 P.S. § 4201(1), requires the state to provide adequate mental retardation services for persons in need of them. Joseph Schmidt has clearly demonstrated his need and the State must respond to it.
 
 
 121
 429 A.2d at 637 (emphasis in original). Just as the state is under a duty to respond to the needs of those developmentally disabled persons who require long-term institutionalization, so must the counties respond to the needs of those who are able to live in the community:
 
 
 122
 (T)he legislative grant of power to the counties under § 301(e)(3) of the Act, 50 P.S. § 4301(e)(3), empowering them to establish additional services and programs "designed to prevent ... the necessity of admitting or committing the mentally disabled to a facility" was intended to be utilized by the counties to minimize the necessity of institutionalization. It was more than a mere grant of power to be used at the county's option.
 
 
 123
 Id. Neither the state nor the counties, then, can point to a lack of currently available facilities as an excuse for failing to live up to their responsibilities to provide adequate care for the mentally retarded.
 
 
 124
 Not only do Pennsylvania statutes and regulations provide for a systematic and comprehensive system of care of the mentally retarded; they also provide that an individualized determination must be made for each and every person as to whether a community living arrangement or institutionalization is most appropriate. Regulations adopted by the Department of Public Welfare, pursuant to a court order of October 26, 1976,[9] specifically provide that the Secretary of Public Welfare shall not
 
 
 125
 receive any (mentally retarded) person (for commitment) except upon judicial determination that the following standard is met:
 
 
 126
 A person shall be determined to be a mentally retarded person in need of residential placement only upon the following findings:
 
 
 127
 (1) The person is impaired in adaptive behavior to a significant degree and is functioning at an intellectual level two standard deviation measurements below the norm as determined by acceptable psychological testing techniques;
 
 
 128
 (2) The impairment and the resultant disability were manifested before the person's 18th birthday and are likely to continue for an indefinite period; and
 
 
 129
 (3) The person, because of his retardation presents a substantial risk of physical injury to himself or physical debilitation as demonstrated by behavior within 30 days of the petition which shows that he is unable to provide for, and is not providing for his most basic need for nourishment, personal and medical care, shelter, self-protection and safety and that provision for such needs is not available and cannot be developed or provided in his own home or in his own community without residential placement.
 
 
 130
 Pennsylvania Bulletin, Vol. 6, No. 48, at 2883-84 (November 13, 1976). Thus no person may be committed as mentally retarded without a judicial determination that provision for his needs cannot be developed absent placement in a community living arrangement or an institution. And surely it cannot be assumed by this court that in making the determination as to which of the two is more appropriate for the person who is to be committed, the Pennsylvania courts would ignore the clear requirement of the MH/MR Act and the Schmidt decision that every mentally retarded person in the care of Pennsylvania be placed in a community living arrangement if at all possible, and that such arrangements must be developed if not currently available. Nor is it defensible for this court to assume, as the majority apparently does, that the defendants in this case-the counties and the officials of the Department of Public Welfare-will flout their duties under the MH/MR Act as clearly and unambiguously specified by the Pennsylvania Supreme Court in Schmidt.
 
 
 131
 Under these circumstances, the appointment of a Master is a gratuitous intrusion by the federal courts into an area of "traditional state authority," Pennhurst, 451 U.S. at 16, 101 S.Ct. at 1539-the health and well-being of the citizenry. Surely such an intrusion cannot be justified after the Supreme Court's decision in Pennhurst. Although, as I noted earlier, the Supreme Court's comments on the appointment of a Master are not directly controlling here, I find them to be extremely pertinent. The Supreme Court stated with virtual unanimity that while the appointment of a Master to enforce rights guaranteed by a federal statute passed pursuant to Congress's fourteenth amendment enforcement powers might be within a federal court's power, there was no justification for appointing a Master to oversee compliance with a federal-state funding statute. Yet if appointment of a Master to oversee compliance with a federal funding statute was too intrusive, how can appointment of a Master to oversee a state's compliance with its own state statutes, regulations, and decisional laws possibly be approved by this court?
 
 
 132
 Indeed, it is apparent that even those members of this court who have affirmed the appointment of a Master are uneasy with that result. The majority opinion itself encourages the defendants to move for relief from the judgment and expresses the hope that a "less elaborate monitoring system" will be considered by the district court. Maj.Op. in No. 81-2381, 673 F.2d at 639. In his separate opinion, Judge Aldisert expresses disenchantment with "the establishment of the master's apparatus." He calls for immediate steps to be taken by the district court to "disassemble the judicially-created administrative hierarchy" of Masters so that state officials can take over their proper state function of supervising the habilitation of the residents of Pennhurst. The approach which I have advocated, in contrast, is more straightforward. I think we ought not to beat around the bush: if the Master's appointment was improvident, in error, or an abuse of discretion-as I have argued it is, and as the majority apparently feels as well, but cannot quite bring itself to say-then this court should so hold.
 
 
 133
 In addition to contravening the clear import of the Supreme Court's Pennhurst decision, the majority's approach is inconsistent with this court's decision in Rennie v. Klein, 653 F.2d 836 (3d Cir. 1981) (en banc). In that case, the district court held that mental patients who were involuntarily committed by New Jersey had a due process liberty right to refuse certain antipsychotic drugs. Although New Jersey had recently enacted legislation guaranteeing mental patients the right to participate in decisions regarding their own treatment, and although regulations had been adopted to implement that right, the district court imposed its own detailed set of procedures for the state to follow. This court affirmed the district court's determination that there was a right to refuse antipsychotic drugs, but held that the district court had erred in imposing its own procedures on the state when the state's own regulations were adequate to protect that right.
 
 
 134
 In my view, Rennie provides a model for the manner in which this court should handle the present case.[10] The proper approach would be to vacate the district court's orders of March 17, 1978 (insofar as it appointed a Special Master) and of April 24, 1980 (appointing a Hearing Master), and direct the district court to enter an order enjoining the defendants to comply with Pennsylvania state law as clearly set out in Schmidt. To be sure, it may be that such an order will ultimately prove inadequate, and that the defendants will not in fact carry out their responsibilities under state law. If so, plaintiffs may return to district court and seek compliance with the injunction. Before this court goes to the extreme lengths of approving a federal Master to supervise and oversee state and county officials' compliance with a decision by their own state supreme court, however, defendants should, as a matter of federal-state comity, be given the opportunity to undertake that compliance themselves. Any other approach constitutes a massive displacement of state authority incompatible with Pennhurst, Rennie, and indeed, with the basic notion of a federal system.
 
 IV.
 
 135
 My disagreement with the majority opinion, then, focuses almost exclusively on the relief ordered by the district court, as modified by our previous en banc decision: the appointment of a federal Special Master and a federal Hearing Master to discharge functions that are properly the responsibility of the Commonwealth under the Commonwealth's own laws. The majority has not directly faced up to what, in my view, is mandated by considerations of federal-state comity and by Supreme Court principles governing the remedial powers of federal courts, and has persisted in leaving the Master in place despite its evident discomfort in doing so.
 
 
 136
 I respectfully dissent.
 
 
 
 [1]
 Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), reversing 612 F.2d 84 (3d Cir. 1979), which affirmed in part 446 F.Supp. 1295 (E.D.Pa.1977)
 
 
 [2]
 612 F.2d at 98
 
 
 [3]
 See Usery v. Allegheny County Inst. Dist., 544 F.2d 148, 155 (3d Cir. 1976), cert. denied, 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977)
 
 
 [4]
 But cf. Civil Rights Cases, 109 U.S. 3, 19 (1883) (Public Accommodations provisions of Civil Rights Act of 1875 unconstitutional under Fourteenth Amendment; "And whether Congress, in the exercise of its power to regulate commerce amongst the several States, might or might not pass a law regulating rights in public conveyances passing from one State to another, is also a question which is not now before us, as the sections in question are not conceived in any such view.")
 
 
 [5]
 612 F.2d at 98
 
 
 [24]
 On remand following our reversal, the Court of Appeals will be in a position to consider the state law issues in light of the Pennsylvania's Supreme Court's recent decision (In re Joseph Schmidt, 494 Pa. 86, 429 A.2d 631 (1981) )
 
 
 [6]
 Id. at 90-94
 
 
 [7]
 Id. at 108-16
 
 
 [8]
 Id. at 109
 
 
 [9]
 Id. at 109-11
 
 
 [10]
 Id. at 111-12. Under Pennsylvania law a court of equity may, in a class action concerning conditions in a state institution, appoint masters to assist in the implementation of a decree. Jackson v. Hendrick, 457 Pa. 405, 321 A.2d 603 (1974). The scope of available equitable relief in an action in a federal court based upon a state law cause of action is not different. E.g., Stern v. South Chester Tube Co., 390 U.S. 606, 88 S.Ct. 1332, 20 L.Ed.2d 177 (1968); Bernhardt v. Polygraphic Co., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956); Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945)
 
 
 [11]
 Id. at 100-03
 
 
 [12]
 But see id. at 122-23 (Seitz, J., dissenting)
 
 
 [13]
 429 A.2d at 636
 
 
 [14]
 Cf. California v. Byers, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971); State Tax Commission v. Van Cott, 306 U.S. 511, 59 S.Ct. 605, 83 L.Ed. 950 (1939). In those cases a state or a state agency successfully petitioned for certiorari because a state court's interpretation of a state statute may have been compelled by an erroneous interpretation of the federal constitution. No petition for certiorari was filed in the Schmidt case, and the Commonwealth does not here urge that Schmidt was the result of a misinterpretation of the MH/MR Act of 1966 compelled by an erroneous view of federal law
 
 
 [15]
 612 F.2d at 115
 
 
 [16]
 Under Section 201(1) of the MH/MR Act of 1966 the Pennsylvania Department of Public Welfare "shall have power, and its duty shall be: (1) To assure within the State the availability and equitable provision of adequate mental health and mental retardation services for all persons who need them, regardless of religion, race, color, national origin, settlement, residence, or economic or social status." Pa.Stat.Ann. tit. 50, § 4201(1) (Purdon 1969). Pennsylvania Counties are obliged
 Subject to the provisions of sections 508 and 509(5) it shall be the duty of local authorities in cooperation with the department (of Public Welfare) to insure that the following mental health and mental retardation services are available:
 (1) Short term inpatient services other than those provided by the State.
 (2) Outpatient services.
 (3) Partial hospitalization services.
 (4) Emergency services twenty-four hours per day which shall be provided by, or available within at least one of the types of services specified heretofore in this paragraph.
 (5) Consultation and education services to professional personnel and community agencies.
 (6) Aftercare services for persons released from State and County facilities.
 (7) Specialized rehabilitative and training services including sheltered workshops.
 (8) Interim care of mentally retarded persons who have been removed from their homes and who having been accepted, are awaiting admission to a State operated facility.
 (9) Unified procedures for intake for all county services and a central place providing referral services and information.
 Pa.Stat.Ann. tit. 50, § 4301(d) (Purdon 1969). Section 508 provides:
 (a) If local authorities cannot insure the availability of any of the services required by section 301, or if they assert that it would be economically unsound to do so, such authorities may make application to the department to be relieved for the period of one year from the duty to insure their availability.
 Such application shall specify: (i) the service or services involved and (ii) facts upon which it seeks relief.
 (b) If the department after consideration of the application and such independent investigation as it shall deem appropriate determines that the application is justified, it may approve the same, in which event, the department may insure the availability of the service or services specified in the application, for the year specified in the application.
 (c) When the department provides said service or services under this section, the liability shall be apportioned in accordance with the appropriate formula determined in accordance with section 509(1).
 (d) Local authorities may make successive application hereunder.
 Pa.Stat.Ann. tit. 50, § 4508 (Purdon 1969). Section 509 provides, inter alia:
 The department (of Public Welfare), subject to the provisions of section 503, shall have the power, and its duty shall be:
 (1) From State and Federal funds, to make annual grants to counties to defray part of the cost of county programs authorized by this act and approved by the department, in the amount of ninety per cent of the excess of all such approved expenditures for such programs over the amount paid for the same purpose from any public or private source directly to participating counties, facilities or individuals.
 (2) To prescribe the time at which the counties shall submit to the department annual plans and annual estimates of expenditures, and revisions thereof, to carry out mental health and mental retardation programs. Such plans and estimates shall contain such information as the secretary by regulation shall prescribe.
 (3) Upon approval of an annual plan and the estimated expenditures for a mental health and mental retardation program, to compute an annual grant in accordance with the formula established in clause (1) of this section.
 ....
 (5) In the event that sufficient funds to pay the full amount of the grants to which the counties may be entitled under the provisions of this section have not been appropriated, to distribute State funds among the counties by a formula reasonably designed to achieve the objectives of this act, provided however, that in such event the counties' financial obligations under this act shall be reduced in accordance with the same formula and the counties shall be required to provide only those services for which sufficient funds are available.
 ....
 Pa.Stat.Ann. tit. 50, § 4509 (Purdon 1969). The district court was quite aware of these provisions, and the allocation of responsibilities among the respective defendants set forth in the order is consistent with them.
 
 
 [17]
 A general objection to prospective relief on Eleventh Amendment grounds was made when the case was first before us. It was rejected on the authority of Edelman v. Jordan, 415 U.S. 651, 667-68, 94 S.Ct. 1347, 1357-58, 39 L.Ed.2d 662 (1974). 612 F.2d at 109. As noted in Part I above, that holding is not affected by the Supreme Court's remand
 
 
 [18]
 Id
 
 
 [19]
 E.g., Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821); Osborn v. Bank of the United States, 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824); Board of Liquidation v. McComb, 92 U.S. 531, 23 L.Ed. 623 (1875)
 
 
 [20]
 Those reasons and their results are illuminated in Orth, The Eleventh Amendment and the North Carolina State Debt, 59 N.C.L.Rev. 747 (1981)
 
 
 [21]
 Pub.L.No.218, § 17, 36 Stat. 557 (1910). See Hutcheson, A Case for Three Judges, 47 Harv.L.Rev. 795, 798-810 (1934); Frankfurter, Distribution of Judicial Power Between United States and State Courts, 13 Cornell L.Q. 499, 519-20 (1928); 45 Cong.Rec. 7256 (1910)
 
 
 [22]
 The defendants concede that "(their) abstention claim is premised on the fact that this Court has already rejected all of plaintiffs' federal claims." (Appellant's Joint Brief on Remand, 52-3). Obviously we have not
 
 
 [23]
 612 F.2d at 114
 
 
 [24]
 Id. at 115
 
 
 [25]
 Id. at 94
 
 
 [26]
 451 U.S. at 29-30, 101 S.Ct. at 1546-47
 
 
 [27]
 NAACP v. The Medical Center, Inc., 599 F.2d 1247, 1257-58 (3d Cir. 1979)
 
 
 [28]
 612 F.2d at 108
 
 
 [29]
 NAACP v. The Medical Center, Inc., 657 F.2d 1322 (3d Cir. 1981)
 
 
 [1]
 See Rennie v. Klein, 653 F.2d 836, 854-55 (3d Cir. 1981) (in banc) (Seitz, C. J., concurring), cert. pending, U.S. No. 81-5334; id. at 855-65 (Garth, J., concurring); Romeo v. Youngberg, 644 F.2d at 173-81 (Seitz, C. J., concurring); Halderman v. Pennhurst State School & Hospital, 612 F.2d 84, 116-31 (3d Cir. 1979) (in banc) (Seitz, C. J., dissenting), rev'd, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)
 
 
 [2]
 T. Hobbes, Leviathan 317 (C. B. MacPherson ed. 1968)
 
 
 [1]
 I fully agree with the majority that on remand, to the extent that our decision can be predicated on state law, this court is not compelled by the Supreme Court's mandate to decide the federal statutory and constitutional issues listed in the Pennhurst opinion
 
 
 [2]
 By "Master," I refer, unless otherwise specifically noted, both to the Special Master appointed by the district court in its original order of March 17, 1978, and to the Hearing Master appointed by the district court in its order of April 24, 1980, pursuant to this court's en banc decision
 
 
 [3]
 I am not alone in my view that the majority opinion has incorrectly construed the Supreme Court's reversal of our earlier en banc decision. Indeed, as I understand it, in the complex of opinions on this point, while there are five votes in favor of upholding the appointment of a Master, only four members of the court do so on the basis of the continuing vitality of our previous en banc decision. In his separate concurring opinion, Judge Aldisert agrees with the position that I have taken, and refuses to "accord any precedential vitality" to our previous decision. Judge Aldisert has joined in the "majority's" affirmance of the Master for purely pragmatic reasons, and without specifying any jurisprudential basis for doing so. See Concurring Opinion of Judge Aldisert in No.81-2381, 673 F.2d 628. Thus, I note that the untenable view that our previous en banc decision has any continuing vitality does not in fact command a majority in this court. Even though I recognize this fact, I continue to identify Judge Gibbons' opinion as the "majority" opinion for ease of reference
 
 
 [4]
 Justice Blackmun, writing separately, see 451 U.S. at 32-33, 101 S.Ct. at 1547-48 (Blackmun, J., concurring in part and concurring in the judgment), said nothing about the appointment of a Master
 
 
 [5]
 While not directly controlling, the Supreme Court's comments about the appointment of a Master are nevertheless extremely significant for this court's resolution of that issue. See Part III infra
 
 
 [6]
 To be sure, this court did find in its en banc decision that state law supported a state law right to habilitation. We did not decide in that opinion, though, that state law provides for a right to habilitation in the least restrictive environment. Indeed, the entire thrust of that opinion was that a violation of federal law having been found, the district court judge could properly appoint a Master to oversee compliance with his order, rather than personally supervise all details of implementation himself. That holding simply has no relevance to the central issue in this case: the propriety of appointing a federal Master to supervise Pennsylvania's compliance with Pennsylvania law
 
 
 [7]
 Because Joseph Schmidt himself could be adequately cared for only in an institution, the Pennsylvania Supreme Court's discussion of the right to the least restrictive environment and the counties' responsibilities technically might be characterized as dictum. See In re Schmidt, supra, 429 A.2d at 638-39 (Larsen, J., concurring). Nevertheless, the Pennsylvania Supreme Court's opinion is so unequivocal in its nature that I agree with the majority that it cannot be read as other than an official interpretation of the Commonwealth's statutory scheme
 
 
 [8]
 The state nevertheless has the duty of overall supervision and control of the counties' discharge of their responsibilities
 
 
 [9]
 See Goldy v. Beal, 91 F.R.D. 451, 453 (M.D.Pa.1981); Goldy v. Beal, 429 F.Supp. 640 (M.D.Pa.1976)
 
 
 [10]
 The majority attempts to distinguish Rennie by stating that "in sharp contrast" to the present case, the New Jersey officials in Rennie were in good faith implementing state procedures that were facially adequate to protect the plaintiffs' constitutional rights. See Maj.Op. in No. 81-2381, 673 F.2d at 639 n.21. This distinction is unconvincing. Clearly, the procedures that Pennsylvania has established are, on their face, fully adequate to protect the state law right to habilitation in the least restrictive environment. Nor is there the slightest basis whatsoever for the majority's suggestion that Pennsylvania might perform its state law obligations in less than good faith. (Indeed, such a suggestion, if taken seriously, would be inconsistent with the majority's clear indication that the district court should, on a Rule 60(b) motion, at the very least sharply cut back on the Master's office, see Maj.Op. in No. 81-2381, 673 F.2d at 639, or eliminate the office entirely, Concurring Opinion of Judge Aldisert in No. 78-1490.) The majority predicates its assumption that Pennsylvania will not implement its duties in good faith on the fact that in 1978, Pennsylvania was contesting the relief sought by the plaintiffs. If that fact alone were sufficient to uphold a finding of bad faith on the part of state officials, however, it would be tantamount to holding that a district court never need allow state officials an opportunity to effect compliance with a decision. More important, the district court never made a finding that the Commonwealth would not implement the district court's relief in good faith. In its 1978 order, the district court merely stated that it could not implement the relief without the aid of a Master. See 446 F.Supp. at 1326. The district court's statement, however, was concerned with the trial judge's own inability personally to supervise the relief. It had nothing to do with the entirely separate question of whether it was necessary in the first instance to have the federal courts-in the form of a Master or the trial judge-take the place of the state in the implementation of the relief