**ALESSI, Cynthia, by her parents, and next friends ALESSI, Richard and Alessi, Enola**

**v.**

**COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF PUBLIC WELFARE, White, John, Secretary of the Pennsylvania Department of Public Welfare, both individually and in his official capacity.**

**Appeal of John WHITE, Secretary of the Department of Public Welfare, Appellant.**

**No. 89–1277.**

United States Court of Appeals, Third Circuit.

Argued July 12, 1989.

Decided Jan. 11, 1990.

Rehearing and Rehearing In Banc Denied Feb. 7, 1990.

Before HIGGINBOTHAM, BECKER and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This appeal is from a grant of a preliminary injunction ordering the Pennsylvania Department of Public Welfare to fund an immediate residential placement for a blind and mentally retarded young woman. The Pennsylvania Department of Public Welfare has insufficient funds to serve adequately all of the mentally retarded individuals in the state who qualify for residential services. It leaves to each county the determination as to how to allocate among needy individuals in that county the limited state funds that the Department provides. This case raises the question whether the Department violates the Fourteenth Amendment to the United States Constitution by its procedures for requesting and allocating state funds and by its failure to provide special funds for an individual who is in dire need of appropriate residential services but is not now receiving them because she is on a waiting list.[1] We conclude that it does not.

### I. *Facts and Procedural Background*

Cynthia Alessi is a 23–year old woman who is profoundly mentally retarded and legally blind. She also suffers from other serious physical and behavioral disabilities. She has a congenital heart defect, is hyperactive, has an active seizure disorder, and experiences "significant behavioral difficulties." Appendix ("App.") at 105–6. From 1978 through June, 1986, Alessi resided at the Royer–Greaves School for the Blind ("Royer–Greaves"), in an educational placement by the Haverford School District of

Gwendolyn T. Mosley (Argued) Calvin R. Koons, Sr. Deputy Atty. Gen., John G. Knorr, III, Chief, Deputy Atty. Gen., Chief, Litigation Section, Office of the Atty. Gen., Harrisburg, Pa., for appellant.

Dennis C. McAndrews (Argued), Wayne, Pa., for appellee.

1. The concurrence concludes that the district court did not have jurisdiction to hear the case. While the issue of jurisdiction must always be determined by the court, there is no rule that requires us to decide the jurisdiction issue as a surprise to counsel who have not raised it before us in any way. Unless it is a matter on which there can be no doubt, we think the better approach for a thoughtful court is to let the parties at least have the opportunity to brief that issue before we decide it. Many months after briefing and oral argument, the concurrence presents several complex arguments which, with all due respect, are far more difficult in analysis than the conclusions they are proffered to support. Without tracing the trail of this unbriefed issue, it is sufficient for us to note that on the present record, we believe that the Eleventh Amendment does not preclude jurisdiction.

Delaware County, Pennsylvania. During those eight years, Cynthia made significant gains for a person with her disabilities and had become happy, emotionally stable, non-self-abusive and toilet trained. She could dress herself and perform simple vocational tasks. At the end of her educational placement, at age 21, Alessi was sent home to her parents. App. at 106; Appellee's Brief ("Apple's Br.") at 4.

Alessi's parents, realizing that her educational entitlement would end in June of 1986, and that the Delaware County Mental Health/Mental Retardation ("MH/MR") Association would be responsible for providing services to her thereafter, applied to a number of federally-funded facilities for the mentally retarded that seemed to be appropriate to Alessi's needs. Apple's Br. at 4–5. All of them rejected her, saying that they were unable to care for someone with her overwhelming disabilities. *Id.* Delaware County has some state facilities equipped to care for Alessi, but no places are available in them at present. The MH/MR Association says that there are no funds to place Alessi in a private facility such as the Royer–Greaves School, which remains willing and able to receive her, and that because of inadequate funds from the Pennsylvania Department of Public Welfare ("DPW" or "Department"), it cannot provide her with *any* appropriate residential service at present. App. at 38–39. The DPW does not allocate money for individual cases; instead, it gives a lump sum to each county and the county distributes it. Delaware County maintains a waiting list of individuals who qualify for care, and provides care as funds become available.[2]

Since her discharge from the Royer–Greaves School, Alessi has been in a day program for six hours a day, and she spends the rest of her time at home with her parents. In three years of such care, she has lost virtually all of the training she had gained during her eight years at Royer–Greaves. App. at 106–07. She is no longer toilet trained and does not use the minimal sign language she had acquired. She engages in serious self-abusive behavior, awakens repeatedly at night screaming, has knocked a door off its hinges and is in danger of harming herself. Unrebutted expert testimony has established that unless she receives appropriate residential care in the near future, she may never be able to regain the basic skills she had so painstakingly acquired. App. at 110.

In October, 1986, Alessi's parents petitioned for her involuntary commitment to an appropriate residential facility pursuant to the Pennsylvania Mental Health and Mental Retardation Act of 1966 ("MH/MR Act"), Pa.Stat.Ann. tit. 50, §§ 4101–4704, § 4406 (Purdon 1969 & Supp.1989).[3] Neither the DPW nor any of its officials or employees was made a party to that action; the DPW was informed of the action, but did not intervene. App. at 107–108. At the conclusion of the commitment hearing, the Court of Common Pleas of Delaware County ordered that Alessi be committed to the Royer–Greaves School at the expense of the DPW. App. at 108. The DPW appealed the order and the appeal was quashed by the Commonwealth Court on the ground that the DPW did not have party status to appeal because it had not intervened. *Commonwealth of Pennsyl-*

---

**2.** At trial, the Director of Mental Retardation Programs for Delaware County testified that 200 people were on waiting lists for residential programs in that county, but that placement could not be provided for them because of insufficient funds. He further testified that the state was supposed to bear the entire cost of residential placement. App. at 43–44.

**3.** The section cited reads in pertinent part:
§ 4406. Civil court commitment
(a) Whenever a person is believed to be mentally disabled, and in need of care or treatment by reason of such mental disability, and examination of such person has been made by

a physician or physicians, ... a petition may be presented to the court of common pleas of the county in which a person resides or is, for his immediate examination or commitment to an appropriate facility for examination, observation and diagnosis.

(b) If, upon examination, it is determined that such person is in need of care at a facility, the examining physicians or director, as the case may be, shall immediately report to said court which may order the commitment of such person for care and treatment.
50 Pa.Stat.Ann. § 4405.

*vania v. Alessi,* 105 Pa.Commw. 453, 455, 524 A.2d 1052, 1053 (1987). In August, 1988, the DPW was held in contempt by the Delaware County Court of Common Pleas for failing to comply with its order, but the Commonwealth Court reversed the contempt order on the ground that the Court of Common pleas had no jurisdiction over the Department in the case. *Dept. of Public Welfare v. Alessi,* 119 Pa.Commw. 160, 163–64, 546 A.2d 157, 158–59 (1988). Alessi filed a Petition for Allowance of Appeal of that decision before the Pennsylvania Supreme Court in September 1988, but the court had not ruled on the petition at the time of this appeal. Apple's Br. at 6. In May 1988, Alessi filed a civil rights action seeking declaratory and injunctive relief and damages against the DPW in the Court of Common Pleas of Delaware County, alleging violations of her Fourteenth Amendment rights pursuant to 42 U.S.C. §§ 1983 and 1985 (1982). She filed a motion for a preliminary injunction at the same time. At the hearing on the motion for the preliminary injunction, the DPW challenged the jurisdiction of the court to determine claims against Commonwealth officers for declaratory and injunctive relief brought under those statutes, and the Delaware County Court of Common Pleas held that it had no jurisdiction with regard to those claims. App. at 109.

In December, 1988, plaintiff filed this motion for declaratory and injunctive relief under 42 U.S.C. §§ 1983 and 1985 in United States District Court for the Eastern District of Pennsylvania and requested a preliminary injunction at the same time. Appellant's Brief ("Applt's Br.") at 7.

In granting the preliminary injunction ordering the DPW to provide funds for an immediate residential placement for Alessi, 710 F.Supp. 127, the district court found that Alessi had a constitutionally protected property interest in appropriate residential services under the Pennsylvania MH/MR Act, 50 Pa.Stat.Ann. § 4406. App. at 119–22. It also found that there was a substantial likelihood that DPW's procedures for funding its residential programs, which regularly resulted in insufficient funds and in this case resulted in the denial of servic-

es for Alessi, were irrational and arbitrary. The court found that the DPW knowingly failed to request in its budget an amount adequate to cover cost of the residential services for all who were entitled to them. In addition, it found that the DPW failed to base allocations on projections of the counties' needs for a given year but instead made across the board cost-of-living increases to the county budgets for the previous year. App. at 122–23. The preliminary injunction that is appealed here ordered the DPW to provide the state funding necessary for Alessi's immediate placement at either the Royer–Greaves School or the Elwyn Institute. App. at 125-26. A stay of the preliminary injunction was granted pending this appeal. App. at 153.

## II. *Discussion*

We have noted the following factors among those that guide the exercise of the trial court's equitable discretion in its decision to grant a preliminary injunction: (1) the probability of irreparable injury to the moving party in the absence of relief; (2) the possibility of harm to the nonmoving party if relief were granted; (3) the likelihood of success on the merits; and (4) the public interest. *United States v. Price,* 688 F.2d 204, 211 (3d Cir.1982). Our authority to review a district court's decision to issue a preliminary injunction is limited. We must affirm the decision unless the court has abused its discretion, committed an obvious error in applying the law or made a serious mistake in considering the proof. *Id.* at 210; *Premier Dental Products v. Darby Dental Supply Co.,* 794 F.2d 850, 852 (3d Cir.1986). With this standard in mind, we shall review the factors to be considered with regard to the grant of the preliminary injunction.

The probability of irreparable injury to Cynthia Alessi if the preliminary injunction is not granted is beyond dispute. Unrebutted expert testimony established the tragic facts of Alessi's severe regression since her educational placement .t Royer–Greaves ended three years ago. She has lost virtually all of the basic human skills and training she had acquired in her eight

years at the school. The district court found that if it refused to grant the requested relief, Alessi would "suffer the irreparable injury of continuing to regress from a body incapable of much more than rocking itself back and forth. Alessi's family cannot afford the expense of residential care, and without it she may regress to the point where she will never be able to regain basic skills." App. at 123. The district court's finding is well supported and it did not abuse its discretion in making it.

The DPW claims that the district court did not discuss the second or fourth factors, the possibility of harm to the Department or to other interested parties and the public interest if the injunction were granted. The DPW notes that in cases involving public issues or policy matters it is particularly appropriate that the court consider possible harm to other interested parties and to the public interest in considering a request for a preliminary injunction. Applt's Br. at 17; *see also Oburn v. Shapp*, 521 F.2d 142 (3d Cir.1975).

■ The DPW argues that court orders requiring it to pay for services for particular individuals severely disrupt the Department's ability to plan and coordinate the equitable distribution of services to the mentally retarded throughout the state. It claims that compliance with such orders requires redistribution of available funds to the counties, which results in other counties' diminished ability to maintain existing services to their current clients, and that compliance with this order will cause it to reduce the amount of community residential funds it has allocated to some or all of the other counties. App. at 115. Counsel for Alessi counters that there is enough flexibility in the DPW budget to allow it to fund Alessi's placement without requiring it to redistribute money to other counties. He suggests that the DPW could reallocate to Delaware County for Alessi's placement part of the approximately one million dollars it budgets annually for conferences and training. App. at 57.

The district court mentioned the DPW's allegations that court orders forcing it to provide money for individuals disrupt its overall plans, but did not discuss them further. We may assume, however, that it concluded that whatever harm the DPW and the public would sustain from the preliminary injunction was not great enough to bar its issuance in the face of the tragic and irreparable consequences for Alessi if it were not issued. We cannot say that the district court abused its discretion in reaching that conclusion. The possible harm caused by issuing this preliminary injunction is not great, and it must be distinguished from the greater harm that might result to the DPW and the public interest if Alessi prevailed on the merits and the DPW had to face such challenges from individuals on a regular basis. The amount involved here is only the cost of paying for Alessi's residential placement until the case has been tried, and the court required that an appropriate bond be posted to cover that cost in the event that Alessi did not prevail on the merits. App. at 126.

We now reach the question of whether Alessi is likely to prevail on the merits. This turns on whether Alessi has a federally protected interest in receiving appropriate residential services from the DPW and whether the DPW violated her fourteenth amendment due process rights in failing to provide such services.

■ The district court in this case did not base its injunction on a substantive due process right to mental retardation services under the fourteenth amendment, and it is clear that such a claim could not succeed under *DeShaney v. Winnebago County Department of Social Services*, — U.S. ——, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) and *Philadelphia Police and Fire Association For Handicapped Children, Inc. v. City of Philadelphia*, 874 F.2d 156 (3d Cir.1989). On appeal, both sides agreed that *DeShaney* and *Philadelphia Police* foreclose plaintiff's substantive due process claims.[4]

4. In *Philadelphia Police*, a case with a fact pattern similar to this one, we noted that the men-

tally retarded require special and continuing care to maintain basic life and social skills and

■ Instead, the district court found that the state MH/MR Act, as interpreted by the Pennsylvania Supreme Court, had created a property interest in appropriate mental retardation services, and that the procedures followed by the state in connection with the failure to provide Alessi with appropriate residential mental retardation services violated her due process rights under the fourteenth amendment. App. at 120–23. Our review of this case on the merits is limited to deciding whether the district court correctly interpreted Pennsylvania law as to the scope of Alessi's state-created property interest in appropriate mental retardation services and to determining what procedures, if any, are required under the fourteenth amendment in connection with the state's failure to provide such services for her.

The Pennsylvania MH/MR Act clearly states that the DPW has a duty "to assure ... the availability and equitable provision of adequate ... mental retardation services for all persons who need them... ' 50 Pa.Stat.Ann. § 4201. The DPW claims, however, that the section does not create an unqualified right to services, but must be read in conjunction with § 4509(5), which anticipates funding shortfalls and requires the DPW, if it receives an appropriation insufficient to fund approved grants,

> to distribute State funds among the counties by a formula reasonably designed to achieve the objectives of this act, provided however, that in such event the counties' financial obligations under this act shall be reduced in accordance with the same formula and the counties shall be required to provide only those

services for which sufficient funds are available.

50 Pa.Stat.Ann. § 4509(5).

The DPW notes that the Pennsylvania Supreme Court has held that the Pennsylvania Constitution prohibits the executive branch from spending more on a program than the legislature designates. Pa. Const. art. III, § 24, as interpreted by *Shapp v. Sloan*, 480 Pa. 449, 468–69, 391 A.2d 595, 604 (1978). It claims that when appropriated funds are insufficient to provide benefits under a statute to all who would otherwise be entitled to them, the executive branch "discharges its duty if it distributes funds available in some rational and equitable manner." Appellant's Brief at 14.

Contrary to appellant's argument, Pennsylvania case law interprets the statute to mean more than that an individual's interest is wholly contingent on appropriated funds. *In re Sauers*, 68 Pa.Commw. 83, 447 A.2d 1132 (1982), *aff'd*, 500 Pa. 342, 456 A.2d 987 (1983), raised the question whether the DPW or the county should pay for residential services for a mentally retarded woman. The court held that it was the DPW's responsibility and suggested that the DPW could obtain additional funds when needed.

> [S]ections 508, 510 and subsection (5) of 509 of the [MH/MR] Act all contemplate the possibility that unbudgeted, unappropriated fiscal demands might be made on the State Treasury to pay for the essential services which the Act requires the Commonwealth to provide under Section 201, 50 P.S. § 4201(1).

*In re Sauers*, 68 Pa.Cmwlth. at 90, 447 A.2d 1132.[5]

---

regressed without that care. 874 F.2d at 158. Because of insufficient funds, such habilitative services had been withdrawn from people living at home in Philadelphia who had undisputed need for them and who would regress without them. *Id.* at 159–60. Nonetheless, we found that under *DeShaney*, they had no substantive due process right to continued services. *Id.* at 167–68. Similarly, in this case, Alessi has no substantive due process right to the services she seeks under the fourteenth amendment, and if her claim is to prevail, it must be based on other grounds. Indeed, her case is weaker than that of the plaintiffs in *Philadelphia Police*, for the

DPW did not withdraw services it was already providing.

**5.** Section 4508 reads in pertinent part:
(a) If local authorities cannot insure the availability of any of the services required by section 301, or if they assert that it would be economically unsound to do so, such authorities may make application to the department to be relieved for the period of one year from the duty to insure their availability.

. . . . .

(b) If the department ... determines that the application is justified, it may approve the same, in which event, the department may

In another case, *In re Schmidt*, 494 Pa. 86, 429 A.2d 631 (1981), the Pennsylvania Supreme Court stated that a mere recitation of practical difficulties in finding an immediate and appropriate placement for a mentally retarded young man (it did not address funding shortfalls) was not enough to discharge the state's obligation. *Id.* 429 A.2d at 637.

It is the state's responsibility to find a placement for Joseph with a staff-patient ratio suitable to his needs. The state will not be allowed to ignore that responsibility and that obligation by stating that an appropriate facility is not immediately available. Section 201(1) of the Act, 50 P.S. § 4201(1), requires the state to provide *adequate* mental retardation services for persons in need of them. Joseph Schmidt has clearly demonstrated

insure the availability of service or services specified in the application, for the year specified in the application.

. . . . .

(d) Local authorities may make successive applications hereunder.
50 Pa.Stat.Ann. § 4508 (footnote omitted).
Section 4509 reads in pertinent part:
The department, subject to the provisions of section 503, shall have the power, and its duty shall be:
(1) From State and Federal funds, to make annual grants to counties to defray part of the cost of county programs authorized by this act and approved by the department, in the amount of ninety per cent of the excess of all such approved expenditures for such programs over the amount paid for the same purpose from any public or private source directly to participating counties, facilities or individuals.
(2) To prescribe the time at which the counties shall submit to the department annual plans and annual estimates of expenditures, and revisions thereof, to carry out mental health and mental retardation programs. Such plans and estimates shall contain such information as the secretary by regulation shall prescribe.

. . . . .

(4) Upon approval of an annual plan and the estimated expenditures for a mental health and mental retardation program, to compute an annual grant in accordance with the formula established in clause (1) of this section.
(5) In the event that sufficient funds to pay the full amount of the grants to which the counties may be entitled under the provisions of this section have not been appropriated, to distribute State funds among the counties by a formula reasonably designed to achieve the objectives of this act, provided however, that

his need and the State must respond to it.

*Id.* at 637 (emphasis in original).

This court has also discussed the relation between the state's obligation to provide mental retardation services and the availability of funding in *Halderman v. Pennhurst State School & Hospital*, 673 F.2d 647 (3d Cir.1982),[6] and has stressed the expectation of a good faith effort by government to find funds to provide needed services.

The *Schmidt* court made clear that the Pennsylvania law imposed the obligation on both levels of government to provide habilitation in that environment providing the least restriction on personal liberty consistent with habilitation. Insofar as financial burdens are concerned, it

is such event the counties' financial obligations under this act shall be reduced in accordance with the same formula and the counties shall be required to provide only those services for which sufficient funds are available.
50 Pa.Stat.Ann. § 4509 (footnote omitted).
Section 4510 reads:
The department may make additional grants to any county participating in an approved mental health and mental retardation plan to assist in establishing the services provided for in such plan, for the first three years of operation of such plan. Said grant shall be supplemental to grants authorized by section 509 but shall not exceed in any one year, ten per cent of the grant made under that section.
50 Pa.Stat.Ann. § 4510 (footnote omitted).

6. In *Halderman v. Pennhurst State School & Hospital*, 446 F.Supp. 1295 (E.D.Pa.1977), a class action was brought by mentally retarded citizens challenging the fact and conditions of confinement in a state institution for the mentally retarded. The District Court for the Eastern District of Pennsylvania rendered judgment for the plaintiffs, 446 F.Supp. 1295, and we affirmed. *Pennhurst State School and Hospital v. Halderman*, 612 F.2d 84 (3d Cir.1979). The United States Supreme Court reversed and remanded. 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1980). On remand, we held that state law provided adequate support, independent of federal law, for the federal court's order enjoining institutionalization of mentally retarded citizens without first making individual determinations that community living arrangements or other less restrictive environments were suitable, since state law recognized the right to habilitation for the mentally retarded in the least restrictive environment possible. 673 F.2d at 656.

merely referred to Sections 508 and 509 of the MH/MR Act of 1966, which impose funding duties on both levels of government, and which provide mechanisms for the allocation of appropriated funds among the counties. The Commonwealth was ordered to find a placement for Schmidt in an institution with a staff-patient ratio suitable to his needs. There is no suggestion in the *Schmidt* opinion that this order would be qualified by the necessity for appropriations. Obviously the *Schmidt* court anticipated that the adjustment mechanisms of Sections 508 and 509 would be operated in good faith. Nothing in the record which is before us on this appeal suggests that those mechanisms will be dismantled, will be operated other than in good faith, or are inhibited by the provisions of this judgment. On the record we, like the Supreme Court of Pennsylvania, must assume that the Pennsylvania legislature intends compliance with its statutes.

*Halderman*, 673 F.2d at 654–55 (footnote and citation omitted).

The courts in *Schmidt, Sauers*, and *Pennhurst* all found that a mere recitation that funds or facilities were not available was not enough to satisfy the DPW's duty to provide services for those in its charge. They expected that the DPW would make a good faith effort to secure sufficient funds "to assure ... the availability ... of adequate ... mental retardation services for all who need them." 50 Pa.Stat.Ann. § 4201(1). The district court found, in the case at bar, that it had not made that effort:

> The testimony established that it is the policy and practice of the Secretary of the Department of Public Welfare to intentionally close his eyes to reality and knowingly request a total annual budget of less funding than is necessary for the adequate residential care of mentally re-

tarded persons in Pennsylvania. In reliance on the Secretary's understated request, the Governor requests insufficient funds from the Legislature for care of the mentally retarded. Thus the Secretary's practice necessarily precludes the mentally retarded from receiving the funding they desperately need and I find that it is arbitrary.

App. at 122–23.

The district court is correct in its description of the process, but it fails to note that, according to unrebutted testimony, it is the Governor's Budget Office, rather than DPW's secretary, who initiates the request of funds known to be inadequate. The DPW's witness, Mr. Gaultier, Director of the Bureau of Mental Retardation Program Support, testified that every year the Governor's Budget Office instructs the DPW as to the amount the DPW should request for the new budget. App. at 50–51, 65. That amount is considerably less than the Department needs to fund its programs fully.[7] The district court attributed this procedure to a desire by the governor to present and by the legislature to pass a budget that appears to provide all the money needed for the care of the mentally retarded so that they will not have to take the political "heat" for failing to provide adequately for the state's citizens who are in need of such services. App. at 87–88. The result is that many people who desperately need services are placed on waiting lists, sometimes, as in Alessi's case, for years.

The Secretary of the DPW is not making the good faith effort contemplated by the *Pennhurst* court to secure the funds necessary for all the individuals in his charge when he neither requests the full amount the Department needs nor seeks supplemental appropriations when the amount initially appropriated is insufficient.[8] The

---

7. Mr. Gaultier testified that, the last time he saw the County plan, the amount requested by the DPW was $90 million less than the counties had requested of it. App. at 66. For the fiscal year 1988–89, Delaware County had requested $13.4 million and was allocated $11.1 million. App. at 69.

8. Mr. Gaultier testified that the Department had requested two supplemental appropriations, both in order to comply with federal mandates. The first request was in compliance with federal court order to pay the City of Philadelphia $4.9 million. The second was in response to a Department of Labor ruling affecting the way employees are paid. App. at 61. The DPW has not

question remains, however, whether his actions violate Alessi's procedural due process rights under the fourteenth amendment.

Alessi also claims, and the district court agrees, that the DPW's methods of allocating funds among the counties is arbitrary. The court said in its opinion,

> The testimony further established that the Secretary utilizes an arbitrary method of allocating the budgeted funds among the counties. Essentially, funding allocation is based on each county's past expenditures (plus an arbitrary increase for all counties), rather than on an individual determination of each county's current needs for the particular fiscal year. In effect, the Secretary's methodology, policy and practice is to deny adequate provision for Cynthia Alessi's needs without giving her case any meaningful consideration.

App. at 122–23.[9] Even if the district court is correct in its designation of this method as arbitrary, there remains the question whether such state action constitutes a violation of Alessi's procedural due process rights under the fourteenth amendment to the Constitution.

 The district court noted that "the Commonwealth need not create a system of benefits for the mentally retarded. Having chosen to extend the right to adequate treatment to persons in Ms. Alessi's position, however, it may not be withdrawn in the absence of procedures that are fundamentally fair." App. at 121–22. We agree with that statement as a general proposition, but find that it does not describe what has happened in this case. Neither Alessi's right to adequate treatment nor the treat-

ment itself has been withdrawn by the DPW. The DPW recognizes Alessi's right to treatment, but claims that the right is conditioned on the availability of funds appropriated by the state legislature. The DPW has not withdrawn treatment that it had been providing for Alessi; she is new to its rolls. When her educational entitlement ended, she applied for services from the DPW under the MH/MR Act and was put on the list of those waiting for residential placement in her county. The DPW does not decide which individuals are put on the waiting list and when individuals on the waiting list are offered placements; those determinations are left to the counties.

In a procedural due process analysis, we must first ask whether the challenged government action deprived the plaintiff of a liberty or property interest that is protected by the due process clause. *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 260, 107 S.Ct. 1740, 269, 95 L.Ed.2d 239 (1987) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985)); *Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–10, 33 L.Ed.2d 548 (1972). In *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Supreme Court addressed the question of due process rights regarding the termination of government benefits that were already being provided, and held that the due process clause required a pretermination hearing before financial aid could be denied under Aid to Families with Dependent Children. However, in a later case, the Court noted that, "[w]e have never held that applicants

---

sought additional funding for individuals on the waiting lists of the various counties for mental retardation services, a number of whom may have a need as urgent and as desperate as Alessi's.

**9.** The inadequacy of this budgeting process was the subject of sharp criticism by the Commonwealth Court of Pennsylvania in a recent case. *City of Philadelphia v. Department of Public Welfare*, —— Pa.Cmwlth. ——, 564 A.2d 271 (1989). That court concluded that the Department had "breached its duty under the [MH/MR] Act to assure the availability and equitable provision

of adequate mental retardation services for all persons who need them." 564 A.2d at 275. [Typescript of opinion, p. 7.]

There is a "rebudgeting" process after the initial allocation to the counties is made. The counties are asked to identify any money that is to be returned to the Department and any needs they have that are not covered by the initial allocations. Any money to be returned to the Department is then redistributed. App. at 56–57. Given the overall inadequacy of funds, however, this process cannot meet even the most urgent needs, such as Alessi's.

for government benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by Due Process clause of the Fifteenth or Fourteenth Amendment." *Lyng v. Payne*, 476 U.S. 926, 942, 106 S.Ct. 2333, 2343, 90 L.Ed.2d 921 (1986) (citing *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 320 n. 8, 105 S.Ct. 3180, 3189 n. 8, 87 L.Ed.2d 220 (1985)). *See also Jordan v. Ben. Rev. Bd. of U.S. Dept. of Labor*, 876 F.2d 1455, 1459 (11th Cir.1989); *Mahone v. Addicks Utility Dist. of Harris County*, 836 F.2d 921 (5th Cir.1988).

This court has accorded procedural due process protection to applicants who did not have present enjoyment of a benefit, as have other federal courts. *See, e.g., Kelly v. Railroad Retirement Board*, 625 F.2d 486 (3d Cir.1980) (applicant for disabled child's annuity under Railroad Retirement Act); *Raper v. Lucey*, 488 F.2d 748 (1st Cir.1973) (applicant for driver's license); *Ressler v. Pierce*, 692 F.2d 1212 (9th Cir. 1982) (applicants for federal rent subsidies); *Butland v. Bowen*, 673 F.Supp. 638 (D.Mass.1987) (applicant for Social Security disability benefits). But in those cases, determinations had been made by the defendants to deny benefits to the plaintiffs, and the plaintiffs were claiming that they had not had adequate procedural protection in the denial process.

In Alessi's case, the DPW has made no determination to deny her benefits, has not withdrawn benefits that it had granted her and has not denied her entitlement to benefits. The DPW acknowledges Alessi's right to and her urgent need for services. The procedures that Alessi claims are in violation of her due process rights are those by which the DPW requests funds from the state and those by which it allocates to the counties the funds it receives. These procedures relate not to a determination of an individual's eligibility for benefits, but rather to the funding process as a whole.[10] This is not the sort of state action that triggers procedural due process protection. We can find no precedent for ordering a revision of general procedures of this type on the grounds that they violate an individual's procedural due process rights when there has been no determination to withdraw or deny rights, and the individual has been placed on a waiting list because of a shortfall of funds.[11] We therefore find that the district court made an error in applying the law. Alessi's procedural due process rights were not violated by the DPW and because of that she has little chance in prevailing on the merits of her claim.

We can imagine the frustration of Cynthia Alessi's parents, who have tried every legal means to obtain the desperately needed care that Pennsylvania should be providing for their daughter and who keep running into blind alleys and dead ends. Unfortunately, their attempt to secure care for their daughter by invoking her procedural due process rights under the United States Constitution must also fail. The fourteenth amendment provides that fundamentally fair procedures must be used in a decision to terminate Alessi's benefits, and may provide that such procedures must be

---

**10.** There is nothing in the record to support the idea that the DPW's procedures for requesting and allocating funds were responsible for the failure to provide a residential placement for Alessi. We simply do not know whether, if the Department had requested the amount it actually needs and if it distributed whatever funds it received to the counties on the basis of projected need, Delaware County would have enough money to fund Alessi's placement. There is no evidence as to whether Delaware County's share of the state appropriation is proportionally greater or smaller than that of other counties.

**11.** If Alessi were asking for a hearing, her claim would also fail, as did a similar claim in *Philadelphia Police*. There, we said, "[H]earings are required as a matter of procedural due process only when 'termination involves state action that adjudicates important rights.'" 874 F.2d at 169 (quoting Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970)). We held that the budget cut that resulted in a cut-back of non-residential services for the mentally retarded, was not such an "adjudication." Similarly, in Alessi's case, there was no adjudication. The DPW's failure to use funds it had budgeted for training for Alessi's placement is not an adjudication, nor is its failure to ask for any additional funds from the state for her, nor are its general funding and allocation procedures. Nor was there a "termination" of services to her by the DPW.

used in a decision to deny her benefits initially. The DPW has made neither decision. It has failed to make a good faith effort to obtain sufficient funds from the state and has failed to allocate the funds it has to the counties in a rational and equitable manner to meet projected needs. Those failures are not the sort of state action that can sustain a claim of a procedural due process violation.

### III. *Conclusion*

For reasons that appear in the foregoing opinion, Alessi's likelihood of prevailing of the merits of her claim are slight, and the grant of the preliminary injunction will be reversed.

Each party to bear its own costs.

BECKER, Circuit Judge, concurring in the judgment in part and dissenting in part.

I join in the majority's lament as to the state of affairs that has given rise to this lawsuit. I also agree with the majority's holding that the preliminary injunction cannot stand, and (incidentally) with its underlying reasoning that the kinds of procedures Alessi has challenged are, in all probability, not regulated by the due process clause. I dissent, however, from the majority's decision to allow the injunctive claim to proceed on remand.

Although Alessi does challenge a kind of state procedure, her injunctive claims bear little relation to that challenge. She does not seek to require the state to employ different procedures; instead, she seeks an injunction requiring the state to pay for her mental health treatment. In essence, she seeks to vindicate a substantive right created by a state statute. Because I believe that the Eleventh Amendment bars a federal court from awarding such relief, I would not only dissolve the preliminary injunction, but also direct the district court to dismiss the injunctive claim forthwith.

**1.** *See Clark v. Barnard,* 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883).

**2.** The Eleventh Amendment provides:

### I.

In the preliminary injunction hearing, the DPW presented an Eleventh Amendment defense to the district court, which rejected it. Because the Department has not mentioned the Eleventh Amendment its brief before this court, I must first address the appropriateness of considering that issue nonetheless.

An Eleventh Amendment defense can be waived.[1] Nonetheless, "because the Eleventh Amendment implicates the fundamental constitutional balance between the Federal Government and the States," *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985), the Supreme Court has fashioned unusually stringent waiver requirements in this context. Thus, "a State will be deemed to have waived its immunity 'only where stated "by the most express language or by such overwhelming implication ... as [will] leave no room for any other reasonable construction."'" *Id.* at 239–40, 105 S.Ct. at 3146 (citations omitted). *Atascadero* involved the construction of a state statute, but the principle that silence or ambiguity cannot imply waiver applies more generally. Thus, "the failure of attorneys representing the state to assert the [Eleventh Amendment] defense does not waive it," P. Bator, D. Meltzer, P. Mishkin & D. Shapiro, *Hart & Wechsler's The Federal Courts and the Federal System* 1213 (3d ed. 1988) [hereinafter *Hart & Wechsler*], even if the defense is asserted for the first time in the Supreme Court itself. *See Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 467, 65 S.Ct. 347, 352, 89 L.Ed. 389 (1945). Under these principles, we cannot deem DPW to have waived its Eleventh Amendment defense simply by failing to include it in its brief at this stage of the proceedings.

By its express terms, the Eleventh Amendment, where applicable, creates a jurisdictional defect.[2] "It deprives a feder-

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of anoth-

al court of *power* to decide certain claims against States that otherwise would be within the scope of Art. III's grant of jurisdiction." *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 119–20, 104 S.Ct. 900, 918–19, 79 L.Ed.2d 67 (1984) (emphasis added); *see also, e.g., Ford Motor Co.*, 323 U.S. at 467, 65 S.Ct. at 352 ("The Eleventh Amendment declares a policy and sets forth an explicit limitation on federal judicial power...."). Thus, "a federal court must examine each claim to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment." *Pennhurst*, 465 U.S. at 121, 104 S.Ct. at 919. It is, to be sure, somewhat anomalous that a constitutional limitation on the federal judicial power can be waived by a party [3] or abrogated by Congress,[4] but that is the Supreme Court doctrine we are bound to apply. Because the Eleventh Amendment defense is jurisdictional if applicable and cannot be deemed waived on these facts, I

find it appropriate, if not necessary, to consider that issue.[5]

## II.

In conceptualizing what purports to be a procedural due process case, it is helpful to begin by considering what Alessi is *not* seeking. She is not seeking the right to notice, a hearing, an attorney, or an impartial arbitrator. She does not desire to make a statement, present witnesses, discover evidence, introduce evidence, or confront adverse witnesses. She demands neither more carefully recorded factfinding, nor a more favorable burden of proof, nor a stricter standard of judicial review. In short, she does not assert the right to any kind of procedure designed to reduce the risk of an erroneous determination whether she is entitled to the benefit she seeks. The reason is simple enough: DPW concedes Alessi's entitlement to free treatment

---

er State, or by Citizens or Subjects of any Foreign State.
U.S. Const. amend. XI.

**3.** *See* Hart & Wechsler, at 1213 (pointing out that ordinarily "the parties lack power to confer jurisdiction on the federal courts").

**4.** *See Pennsylvania v. Union Gas Co.*, —— U.S. ——, 109 S.Ct. 2273, 2286, 105 L.Ed.2d 1 (1989) (Stevens, J., concurring) ("A statute cannot amend the constitution.").

**5.** In a footnote in *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), the Supreme Court rejected the view that the Eleventh Amendment is "jurisdictional in the sense that it *must* be raised and decided by this Court on its own motion." *Id.* at 515 n. 19, 102 S.Ct. at 2567 n. 19 (emphasis added). Footnote nineteen thus created an exception to the general rule that federal courts have an independent duty to determine their own jurisdiction. *See Mansfield, Coldwater & Lake Mich. Ry. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884). The Court's two stated reasons for doing so—first, "the importance of state law in analyzing Eleventh Amendment questions," and second, the possibility that the state "may, in some circumstances, waive this defense," 457 U.S. at 515 n. 19, 102 S.Ct. at 2567 n. 19—give some clue as to the import of footnote nineteen. The respondents in *Patsy* appeared to waive their Eleventh Amendment defense before the Supreme Court: after having been expressly asked about the issue at oral argument, counsel urged the Court to affirm solely on other grounds. *See id.* Given this

background, footnote nineteen might simply be a reaffirmation of the well-settled anomaly that a state can waive a defense that would otherwise be jurisdictional. On this view, footnote nineteen would have no applicability here, where DPW's silence cannot imply waiver. But even if footnote nineteen rested further on an institutional concern about requiring the Supreme Court to evaluate issues of state law in the first instance, it is probably inapplicable nonetheless, because (1) the Eleventh Amendment issue was presented to, and decided by, the district court in this case; (2) courts of appeals are institutionally far better situated than the Supreme Court to construe the laws of the states in which they sit, and (3) the kind of Eleventh Amendment question in *Patsy*—whether a particular agency is "an arm of the state for purposes of the Eleventh Amendment," *id.*—is much more bound up in particular intricacies of state law and practice than the kind of Eleventh Amendment question here—whether a federal court can vindicate a state-law entitlement on the basis of a procedural due process attack against the state's administration of that entitlement program. Finally, even if footnote nineteen were applicable, we could still raise an Eleventh Amendment issue *sua sponte*, as the *Patsy* Court itself did, and rule on it if we deem it "appropriate" to do so. *See id.* Because of the various differences between this case and *Patsy*, I would deem it appropriate, even assuming it were not mandatory, for this court to "ask and answer" jurisdictional questions—"first, of this court, and then of the court from which the record comes." *Mansfield*, 111 U.S. at 382, 4 S.Ct. at 511.

under section 4201 of the MH/MR Act, but argues that that entitlement is qualified by the availability of funds. More adjudicative "procedure," as that term is commonly understood, would clearly be pointless.

Alessi attacks assertedly "procedural" violations of a very different sort—the "procedures" by which DPW (1) requests its funds and (2) allocates those funds among the various counties. "Procedures" for requesting funds involve the tactics by which DPW persuades, cajoles, implores, or negotiates with the executive, the legislature, and various other state agencies, each of which is itself competing for the same limited pool of funds. "Procedures" for allocating funds involve the way the agency makes wholesale policy determinations about how best to apportion its unrestricted funds among various counties and programs, in light of statutory obligations that, as a practical matter, are not always jointly satisfiable. "Procedures" of this sort embrace notions fundamentally different from the more familiar adjudicative procedures that make up the conceptual universe of cases like *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

The linchpin of the majority's opinion is the proposition that the "procedures" challenged by Alessi "[are] not the sort of state action that triggers procedural due process protection." Ante at 1453. I am inclined to agree, for any suggestion to the contrary must distinguish a settled line of cases holding that the due process clause does not constrain the methods by which a state actor may legislate, promulgate rules, or develop generally applicable policies,[6] the rejection of which in this context would raise troubling and difficult questions of justiciability,[7] federalism,[8] and the scope of a federal court's remedial equitable powers.[9] Despite these reservations, however, I do not believe that the constitutionality of the "procedures" by which DPW seeks and allocates its funds is before us at this time.

Alessi alleges that these procedures violate constitutional standards. She does not seek an injunction to impose new and improved procedures on DPW in the future, however. Nor does she seek damages for harm already done to her by DPW's past conduct.[10] She does seek a declaratory judgment that DPW's procedures are unconstitutional, but that claim (despite the district court's apparent receptivity towards it) is not yet before us. Primarily, Alessi seeks a permanent injunction ordering DPW to pay for her treatment, and what is before us at this time is a preliminary injunction temporarily affording that very relief. Because I believe that the Eleventh Amendment barred the district

---

**6.** *See, e.g., Minnesota St. Bd. for Comm. Colleges v. Knight*, 465 U.S. 271, 283–87, 104 S.Ct. 1058, 1065–67, 79 L.Ed.2d 299 (1984); *Bi-Metallic Investment Co. v. State Bd. of Equalization*, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915).

**7.** *Cf. Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962) (holding that a claim presents a nonjusticiable political question when it "lack[s] judicially discoverable and manageable standards for resolving it" or when it cannot be decided "without an initial policy determination of a kind clearly for nonjudicial discretion"). After *Baker*, the various categories of political questions are undisputably narrow. *See Davis v. Bandemer*, 478 U.S. 109, 126–27, 106 S.Ct. 2797, 2807–08, 92 L.Ed.2d 85 (1986). Nonetheless, there would appear to be few inquiries less susceptible of "judicially discoverable and manageable standards" and more appropriately left to "nonjudicial discretion" than, for example, whether a state agency is lobbying the governor and the state legislature for adequate funding with sufficient vigor.

**8.** *Cf. Rizzo v. Goode*, 423 U.S. 362, 377–80, 96 S.Ct. 598, 607–08, 46 L.Ed.2d 561 (1976) (holding that "appropriate consideration must be given to principles of federalism" in determining whether to impose injunctions mandating new operating procedures on state agencies).

**9.** *Cf. Missouri v. Jenkins*, —— U.S. ——, 109 S.Ct. 1930, 104 L.Ed.2d 402 (1989) (granting certiorari to consider whether a court can order statewide tax increases to fund a broad remedial decree it has imposed).

**10.** Of course, the Eleventh Amendment would bar a federal court from awarding such damages to be paid out of state funds. *See Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Alessi could have sought damages against White in his individual capacity, but failed to do so.

court from affording such relief—regardless of the constitutionality of the DPW's procedures for raising and allocating its funds—I would dissolve the injunction on that basis.

## III.

Under due process analysis, "[t]he categories of substance and procedure are distinct." *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985). Despite familiar conceptual objections to this distinction,[11] maintaining it is the only way to reconcile how the due process clause can itself create no affirmative entitlement to government services,[12] but nonetheless protect substantive entitlements created and defined exclusively by state law.[13] In this case, federal law supplies only procedures, for Alessi concedes that her underlying entitlement to free treatment arises, if at all, under state law. On the basis of that entitlement, Alessi sought and obtained a preliminary injunction ordering treatment, not more procedures. In any meaningful sense, her claim for treatment is "substantive," not "procedural," and therefore state, not federal. Stripped to its essentials, therefore, this case presents the question whether a federal court can order a state agency to obey *state* law.

In *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the Supreme Court held that the Eleventh Amendment bars suits in federal court against state officials for violation of state law. The present case is indistinguishable from *Pennhurst*. As in *Pennhurst*, the decree under consideration is an injunction ordering DPW to provide benefits that the MH/MR Act allegedly requires it to provide. This case also involves a closely related claim that is indisputably federal (the claim seeking a declaratory judgment that some of DPW's *procedures* are unconstitutional), but *Pennhurst* makes clear that the doctrine of pendent jurisdiction cannot create jurisdiction over claims—such as Alessi's injunctive claims—otherwise barred by the Eleventh Amendment. *See id.* at 117–23, 104 S.Ct. at 917–200. *Pennhurst* thus prevents federal courts from entertaining claims of entitlement against state agencies that arise under state law, and Alessi cannot avoid this rule by attempting to recharacterize what is obviously a state-law claim for subsidized treatment as a federal claim for more procedure.[14]

In sum, I agree with the majority's decision that the preliminary injunction cannot stand. I base this conclusion, however, not on the likely constitutionality of the challenged procedures, but on the district court's lack of jurisdiction to entertain an artfully pleaded claim for benefits under Pennsylvania's MH/MR Act. Thus, I would order the district court to dismiss Alessi's injunctive claim forthwith. Although I have expressed some doubt about whether the due process clause restricts the kind of procedures Alessi seeks to have declared unconstitutional, I believe that her declaratory judgment claim is properly be-

---

**11.** *See, e.g.*, Easterbrook, "Substance and Due Process," 1982 Sup.Ct.Rev. 85, 112–13 ("Procedural rules are just a measure of how much the substantive entitlements are worth, of what we are willing to sacrifice to see a given goal attained.").

**12.** *See, e.g., DeShaney v. Winnebago Co. Dep't of Soc. Servs.*, —— U.S. ——, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).

**13.** *See, e.g., Loudermill*, 470 U.S. at 539–41, 105 S.Ct. at 1491–93; *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

**14.** Nor can the preliminary injunction ordering subsidized treatment be justified as somehow remedial to Alessi's declaratory judgment claim, which does attack the DPW's procedures. It is well-settled that "the nature of the [constitutional] violation determines the scope of the [equitable] remedy" a federal court may impose. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). Thus, even if a federal court found DPW's fundraising and allocation procedures to be unconstitutional, the only equitable relief it could impose as a result would be an injunction—be it structural, negative, or somewhere in between—designed to ensure that DPW adopts and employs constitutionally adequate *procedures* in the future. As noted above, however, the district court ordered treatment, not more procedure.

fore the district court at this time, and may proceed.

